T.C. Memo. 2019-84

UNITED STATES TAX COURT

MARTIN A. KAPP, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18468-11L, 18470-11L.          Filed July 9, 2019.

P and his employees prepared thousands of tax returns and/or schedules for mariner taxpayers for the taxable years 2000 through 2006. The tax returns and schedules consistently claimed expense deductions for meals and incidental expenses using revenue procedures permitting taxpayers to deduct the cost of meals and incidental expenses paid or incurred without the need to substantiate the amount. It was standard operating practice of marine companies (deep sea, tugboat, offshore, offshore oil rig, and marine ferry) to provide meals at no cost to mariners. Some of P's mariner clients were involved in litigation in this Court relating to the deductibility of meals and incidental expenses. While the Court held that mariner taxpayers were entitled to deduct incidental expenses incurred while at sea, this Court did not hold that they were entitled to deductions for meals, the cost of which they did not incur. <u>Johnson v. Commissioner</u>, 115 T.C. 210 (2000); <u>Westling v. Commissioner</u>, T.C. Memo. 2000-289.

P claimed a full victory in the <u>Johnson</u> and <u>Westling</u> cases and indicated in websites and advertisements that mariners could use revenue procedures to deduct the cost of meals even if furnished by the employer. P and his employees continued to prepare returns and schedules claiming such deductions. Beginning in November 2003 and into 2004 the IRS investigated P's return preparation practices. There was a series of meetings between P and his counsel and IRS representatives. P was advised in writing in the spring of 2005 by his counsel that there was little if any authority which would permit a mariner taxpayer to use the revenue procedures to deduct the cost of meals furnished by the employer. Despite this advice, P continued to prepare returns and schedules claiming such deductions and continued to assert in public domains that mariner taxpayers could qualify for a meal deduction in such circumstances.

The United States filed a complaint in April 2006 seeking an injunction "to restrain and enjoin * * * [P] from preparing federal income tax returns based on the mariner tax deduction". In August 2007 the U.S. District Court for the Central District of California granted the Government's motion for summary judgment, holding that P be permanently enjoined pursuant to I.R.C. sec. 7407 and that the so-called mariner tax deduction was illegal and in violation of I.R.C. sec. 6694. The order related to the period Jan. 1, 2000, through Aug. 20, 2007. In compliance with the order of the U.S. District Court to provide a list of persons or entities for whom he prepared returns (or portions of a return) asserting or claiming the position that mariners may claim a tax deduction for meals provided without cost, P filed a 117-page client list naming more than 5,000 taxpayers. P appealed the entry of permanent injunction, and the U.S. Court of Appeals for the Ninth Circuit affirmed the decision of the U.S. District Court. <u>United States v. Kapp</u>, 564 F.3d 1103 (9th Cir. 2009). After the permanent injunction, this Court issued two additional opinions relating to P's mariner clients. The Court again made clear that the Opinion in <u>Johnson</u> addressed the issue that a mariner taxpayer could not deduct the cost of meals furnished by the employer. <u>Zbylut v. Commissioner</u>, T.C. Memo. 2008-44; <u>Balla v. Commissioner</u>, T.C. Memo. 2008-18.

[*3]    In June 2008 the IRS assessed I.R.C. sec. 6701 penalties based on 5,193 tax returns and/or schedules prepared by P for the period 2000 through 2006. The IRS issued lien and levy notices, and P submitted a written request for a CDP hearing. P challenged the penalties at the hearing. After notices of determination were issued, P filed a timely petition challenging the penalties determined for the taxable years 2000 through 2006. The Court dismissed as to taxable years 2000 and 2001 for lack of jurisdiction. Therefore, the penalties at issue are based on 5,167 tax returns and/or schedules P prepared for taxable years 2002 through 2006.

    Held: R has satisfied his burden of proving that P prepared tax returns for the years in issue with knowledge that the returns and/or schedules prepared would result in understatements of tax.

    Held, further, R's determination is sustained to the extent that relevant returns were made part of this record.

Robert B. Martin, Jr., for petitioner.

Norah Demirjian, Halvor R. Melom, and Daniel V. Triplett, Jr., for

respondent.

CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION . . . . . . . . . . . . . . . . . . 6

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    I.    Petitioner's Education and Professional History. . . . . . . . . . . . . . . . 8
    II.    Petitioner's Practice and Mariner Clients Generally. . . . . . . . . . . . . 9
    III.    The Johnson and Westling Cases . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    IV.    IRS Guidance After the Johnson and Westling Cases . . . . . . . . . . . 16
        A.    Revenue Procedures for the Years in Issue. . . . . . . . . . . . . . . 16

**[\*4]**

       B.     Chief Counsel Advice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.     Petitioner's Actions After the Johnson and Westling Cases. . . . . . . 19

       A.     Communications With Ric Hulshoff. . . . . . . . . . . . . . . . . . . . . 19

       B.     Communications With Mariner Clients . . . . . . . . . . . . . . . . . . 20

       C.     Websites. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       D.     Articles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       E.     Documents Created for Mariner Clients . . . . . . . . . . . . . . . . . 27

VI.    Marine Company Industry Practices . . . . . . . . . . . . . . . . . . . . . . . . 29

       A.     Cheramie Marine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

       B.     Matson Navigation Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

       C.     Dann Ocean Towing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       D.     Mariner Edward Roach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       E.     Edison Chouest Offshore (ECO). . . . . . . . . . . . . . . . . . . . . . 35

VII.   Petitioner's Conversations With Charles Comeaux . . . . . . . . . . . . 36

VIII.  Petitioner's Income Tax Return Preparation Practices for Years in
Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

       A.     Income Tax Return Preparation Practices Generally . . . . . . . 38

       B.     Supplemental Sailor Travel Schedules . . . . . . . . . . . . . . . . . . 39

       C.     Mr. Roach's Income Tax Returns for 2004 Through 2006 . . 40

IX.    The IRS Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       A.     Examining Officer Tiffany Sim. . . . . . . . . . . . . . . . . . . . . . . . 42

       B.     Revenue Agent George Campos . . . . . . . . . . . . . . . . . . . . . . . 44

       C.     Draft Interoffice Memorandum. . . . . . . . . . . . . . . . . . . . . . . . 52

       D.     Petitioner's Website Posting During the Investigation. . . . . . 53

X.     Civil Case and the Permanent Injunction . . . . . . . . . . . . . . . . . . . . 55

       A.     Civil Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

       B.     Petitioner's Actions After the Complaint Was Filed . . . . . . . 57

       C.     Depositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

       D.     Permanent Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

XI.    Compliance With the Permanent Injunction and Amended Returns .62

       A.     Client List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

       B.     Amended Income Tax Returns . . . . . . . . . . . . . . . . . . . . . . . . 63

       C.     Letter to Michael Pahl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

XII.   Appeal to the Court of Appeals for the Ninth Circuit. . . . . . . . . . . 65

XIII.  The Balla and Zbylut Cases Before the Tax Court . . . . . . . . . . . . . 66

       A.     Balla v. Commissioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

       B.     Zbylut v. Commissioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**[*5]** XIV. Penalty Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XV. Income Tax Returns in the Record . . . . . . . . . . . . . . . . . . . . . . . . 72

XVI. CDP Hearing and Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

I.  Procedural Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

A.  Evidentiary Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

1.  Admissibility of Civil Penalty Approval Form. . . . . . . 76

2.  Respondent's Relevancy Objections . . . . . . . . . . . . . . 83

3.  Petitioner's Relevancy Objection . . . . . . . . . . . . . . . . 84

B.  Petitioner's Motions To Strike . . . . . . . . . . . . . . . . . . . . . . . 85

1.  Appendix 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

2.  Appendix 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

II.  Collection Review and Section 6701(a) . . . . . . . . . . . . . . . . . . . . 91

A.  Collection Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

B.  Section 6701 Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

1.  Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

2.  Aiding, Assisting, or Preparing With Knowledge of Use of Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

3.  Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

4.  Understatement of Liability . . . . . . . . . . . . . . . . . . . . 109

APPENDIX A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

APPENDIX B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

APPENDIX C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

**[\*6]**     MEMORANDUM FINDINGS OF FACT AND OPINION

PANUTHOS, <u>Special Trial Judge</u>:  These consolidated cases are before us for review of two determinations by the Internal Revenue Service (IRS or respondent)[1] Office of Appeals (Appeals Office) following two collection due process (CDP) hearings conducted pursuant to sections 6320(b) and (c) and 6330(b) and (c).[2]  Petitioner (also referred to as Mr. Kapp) seeks review of the determinations by the IRS to uphold two notices of Federal tax lien filing (lien notices) and a notice of proposed levy to collect section 6701 penalties related to tax returns and tax documents petitioner prepared for his clients for tax years

---

[1]The Court uses the term "IRS" to refer to administrative actions taken outside of these proceedings.  The Court uses the term "respondent" to refer to the Commissioner of Internal Revenue, who is the head of the IRS and is respondent in these cases, and to refer to actions taken in connection with these cases.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*7] 2002, 2003, 2004, 2005, and 2006.[3]  Petitioner timely petitioned this Court

with respect to each notice of determination.[4]

The issue before the Court is whether and to what extent the collection

action should be sustained.  Since petitioner did not present collection alternatives,

the only real issue is whether petitioner is liable for section 6701 penalties for tax

years 2002, 2003, 2004, 2005, and 2006 (years in issue).[5]

The section 6701 penalties for the tax years in issue are as follows:

---

[3]Although sec. 6701 does not require a penalty to be assessed for a particular taxable year, the IRS has a general practice of identifying an assessment of a sec. 6701 penalty with the year that the tax document in issue was submitted to the Government.  See Chief Counsel Advice 201531015 (July 31, 2015).

[4]On July 14, 2011, the IRS issued to petitioner a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, upholding the notice of Federal tax lien filing for taxable years 2001, 2002, 2003, 2004, 2005, and 2006.  In response to this notice petitioner filed a petition on August 9, 2011, commencing the case at docket No. 18470-11L.  Also on July 14, 2011, the IRS issued to petitioner a second Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, upholding the notice of proposed levy for taxable years 2002, 2003, 2004, 2005, and 2006.  In response to this notice petitioner filed a petition on August 9, 2011, commencing the case at docket No. 18468-11L.  On July 23, 2012, the parties filed a joint motion to consolidate the cases for trial, briefing, and opinion, which the Court granted on August 1, 2012.

[5]The Court previously granted respondent's unopposed motion to dismiss for lack of jurisdiction and to strike as to the taxable years 2000 and 2001 in the case at docket No. 18468-11L, as well as respondent's motion to dismiss for lack of jurisdiction and to strike as to the taxable year 2000 in the case at docket No. 18470-11L.  Therefore, the sec. 6701 penalties for petitioner's taxable years 2000 and 2001 are not in issue in either case.

[*8]

| Year | Amount |
|------|--------|
| 2002 | $100,000 |
| 2003 | 105,000 |
| 2004 | 1,822,000 |
| 2005 | 1,785,000 |
| 2006 | 1,355,000 |
| Total | 5,167,000 |

FINDINGS OF FACT

Some of the facts have been stipulated, and we incorporate the stipulation of facts by this reference. Petitioner resided in California when he timely filed the petitions.

I.    Petitioner's Education and Professional History

Petitioner graduated from Pierce College with an associate's degree in 1969 and from California State University, Northridge, with a bachelor of science degree in 1972. In 1983 petitioner became licensed as a certified public accountant (C.P.A.) and was still licensed at the time of trial.

Petitioner worked as an office auditor for the IRS for less than a year. Petitioner also taught college-level accounting and Federal income taxation

**[*9]** classes at Pepperdine University and Los Angeles City College for 13 years.[6]

Petitioner considered himself an expert, particularly with respect to tax issues for

transportation workers.  He came to this conclusion on the basis of self-study, not

because he had taken any specific course or received any specialized certification.

II.    Petitioner's Practice and Mariner Clients Generally

Petitioner focused his income tax return practice on transportation workers,

including airline pilots and railroad workers.  Sometime before November 2000

petitioner began offering income tax preparation services through "Martin A.

Kapp, C.P.A., E.A., An Accountancy Corporation".  As of February 2004

petitioner employed 10 people whom he also directly supervised; these employees

were income tax return preparers and clerical workers.[7]

---

[6]It is unclear when petitioner was an office auditor or when he began or stopped teaching, but the record indicates that he was teaching in 1989.

[7]Petitioner supervised and approved the work of his employees.  If a document was created by petitioner's office, it was either created by or approved by him.  For the sake of simplicity, we will refer to all relevant tax documents as the work of petitioner, but some of the documents and other materials referenced in this opinion may have been created by one of his employees and then approved by him.

[*10] Petitioner began preparing income tax returns for mariners[8] in approximately 1993. Petitioner prepared income tax returns for several types of mariners: (1) deep sea sailors (sometimes referred to herein as oceangoing or deep-ocean sailors), (2) tugboat mariners (sometimes referred to herein as tug and barge or tug/barge sailors), (3) offshore mariners, (4) offshore oil rig workers, and (5) marine ferry drivers. Deep sea mariners usually work on vessels making transcontinental trips or deep sea trips and are at sea for long periods. Tugboat mariners work on tugboats that haul barges, and some of them return to port more frequently than deep sea mariners. Offshore mariners travel hundreds of miles to offshore locations and typically travel on extended overnight trips. Offshore oil rig workers work on oil rigs in the Gulf of Mexico. Marine ferry drivers repeatedly drive a ferry on a set route with one or more stopping points; some trips last less than a day and others are longer, overnight trips.

As of 2006 petitioner's mariner client base broke down roughly as follows: (1) 75% were deep sea mariners, (2) 18% were tugboat mariners, (3) 5% were offshore mariners, (4) 1% were offshore oil rig workers, and (5) 1% were marine ferry drivers.

---

[8]Petitioner used the terms "mariner" and "sailor" interchangeably throughout his business advertisements, articles and website posts. Consequently, both terms are used herein.

**[*11]** III.　　The Johnson and Westling Cases

Petitioner's mariner clients included Marin Johnson and Jim Westling, each of whom had a case before the Court regarding deductions for unreimbursed employee business meals (meal expenses) and incidental expenses (incidental expenses). See Johnson v. Commissioner, 115 T.C. 210 (2000); Westling v. Commissioner, T.C. Memo. 2000-289, 2000 WL 1310659.

During 1994 and 1996 Mr. Johnson resided in the State of Washington and worked as a mariner for Crowley American Transport, Inc. He was a deep sea mariner and captain of a vessel that transported military vehicles and equipment to various destinations in the United States and around the world. Mr. Johnson would work aboard the vessel for approximately four months at a time and then take two months of vacation. Mr. Johnson's schedule required that he work continuously for long periods on the vessel and eat and sleep on the vessel while working.

During 1996 Mr. Westling resided in the State of Washington and worked as a mariner for Silver Bay Logging, Inc. He was captain of a tugboat that transported barges in and around Alaska. Mr. Westling would work on the tugboat for 30 days at a time, and his schedule required that he eat and sleep

[*12] aboard the tugboat while working. Mr. Westling worked and traveled on the tugboat for 307 days in 1996.

Mr. Johnson's and Mr. Westling's employers provided each of them with lodging and meals without charge while they worked on their respective vessels. Mr. Johnson and Mr. Westling each purchased "personal" items such as hygiene products and safety equipment while on board because these items were not provided by their employers. Neither Mr. Johnson nor Mr. Westling was reimbursed by his employer for purchasing these items, nor did either mariner retain receipts for these purchases.

Petitioner prepared (1) Mr. Johnson's amended Federal income tax return for taxable year 1994 and his Federal income tax return for taxable year 1996 and (2) Mr. Westling's Federal income tax return for taxable year 1996. For each client's 1996 Federal income tax return[9] petitioner claimed miscellaneous itemized deductions for unreimbursed employee business meals and incidental expenses, computed by using the full Federal per diem rates for the meals and incidental expenses (M&IE rate) referenced in Rev. Proc. 96-28, 1996-1 C.B. 686,

---

[9]Mr. Johnson's 1994 amended Federal income tax return claimed a deduction for only incidental expenses; the miscellaneous itemized deduction did not include meal expenses.

**[\*13]** <u>superseding</u> Rev. Proc. 94-77, 1994-2 C.B. 825,[10] multiplied by the number

of days traveling for work.  Petitioner attached to each return schedules he had

prepared reflecting the travel destinations for work, determined by the various

ports to which each mariner had traveled while aboard the vessel and the number

of days traveling.

The IRS determined that neither Mr. Johnson nor Mr. Westling was entitled

to deduct any of the unreimbursed employee business meals or incidental expenses

reported for 1996.  Mr. Johnson and Mr. Westling each separately petitioned the

Tax Court, and their cases were consolidated for the purpose of trial and briefing.

At trial the IRS asserted the following:  (1) each taxpayer did not have a tax home

and thus could not deduct the claimed expenses as "away from home"

unreimbursed employee business traveling expenses under section 162;[11] (2) each

---

[10]For over two decades the Commissioner has issued revenue procedures which specify the Federal travel regulations M&IE rate as the amount that a taxpayer may deduct in lieu of substantiating the actual cost of meals and incidental expenses paid or incurred while traveling for work.  <u>See</u> Rev. Proc. 90-38, 1990-2 C.B. 363, <u>amplifying, clarifying, and modifying</u> Rev. Proc. 89-67, 1989-2 C.B. 795, and subsequent revisions.

[11]Sec. 162(a)(2) allows a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business, including traveling expenses (including amounts expended for meals and lodging) while away from home in pursuit of a trade or business.  <u>See</u> <u>Commissioner v. Flowers</u>, 326 U.S. 465 (1946). Sec. 162 does not, however, allow a taxpayer to deduct travel expenses

(continued...)

[*14] taxpayer did not prove that he actually incurred the claimed expenses and testimony alone is insufficient proof of same; and (3) each taxpayer could not use the revenue procedures to ascertain the deductible amounts of these expenses because they do not apply when only incidental expenses are incurred. At the trial each taxpayer testified that he had paid incidental expenses while working and that he could not provide receipts to substantiate his purchases.

On September 15, 2000, the Court filed opinions in the cases of Johnson v. Commissioner, 115 T.C. 210, and Westling v. Commissioner, 2000 WL 1310659. In each opinion the Court held that because the taxpayer traveled continuously for his work and did not have a principal place of employment, his personal residence was his tax home; thus for tax purposes, he was "away from home" while working aboard his vessel. Additionally, the Court held that (1) each taxpayer was entitled to use the M&IE rates set forth in the revenue procedures to compute his deductible amount of incidental expenses because he had credibly testified that he paid those expenses and had substantiated the time, place, and business purpose as

_____

[11](...continued)
attributable to personal, living, or family expenses. See sec. 262. Deductions for travel expenses are also subject to the strict substantiation requirements of sec. 274(d), which requires that a taxpayer substantiate by adequate records (or sufficient evidence to corroborate the taxpayer's own statement) the amount, time, place, and business purpose of an expense.

**[\*15]** required by section 274(d) and that (2) each taxpayer could not compute deductions using "the full M&IE rates" because "[w]e do not read the revenue procedures to allow a taxpayer to use the full M&IE rates when he or she incurs only incidental expenses." Johnson v. Commissioner, 115 T.C. at 224-227. Thus, each taxpayer could deduct only incidental expenses and could not deduct meal expenses that he had not incurred. Id. at 227.

In Johnson v. Commissioner, 115 T.C. at 226 n.8, the Court also stated that

> Rev. Proc. 90-60, sec. 6.03, 1990-2 C.B. 651, 655, does not apply because petitioner was never responsible for the cost of his meals. Moreover, the fact that 41 C.F.R. sec. 301-7.12(a)(2) (1994 & 1996) provides explicitly that the M&IE rate must be reduced when the Government provides an employee with meals at no charge counters petitioner's argument that we should not reduce the M&IE rates to take into account his employer-provided meals. [Emphasis added.]

The Court further stated that "petitioner has not specified the dollar amounts which he actually paid for any of his incidental expenses", and thus he could not deduct actual costs or take advantage of the exception set forth in Notice 95-50, 1995-2 C.B. 333 (no receipts are required for expenditures of less than $75 which are incurred after October 1, 1995). Johnson v. Commissioner, 115 T.C. at 228 & n.11.

In Westling v. Commissioner, 2000 WL 1310659, at \*3, the Court stated that "[u]nder the precedent of Johnson" Mr. Westling "is entitled to deduct the

**[*16]** incidental expense portion of the applicable M&IE rates for his points of travel as set forth on his schedule." The opinion did not hold that the taxpayer could deduct the cost of meals furnished by the employer.

Petitioner did not represent the taxpayer in either the <u>Johnson</u> or the <u>Westling</u> case before the Court.[12] Petitioner read the opinions shortly after they were released on September 15, 2000.

IV.   <u>IRS Guidance After the Johnson and Westling Cases</u>

A.   <u>Revenue Procedures for the Years in Issue</u>

The Commissioner issues revenue procedures which specify, among other things, that an employee traveling away from home for business may use the M&IE rate from the Federal travel regulations to compute the deductible amount of unreimbursed employee business meals and incidental expenses paid or incurred. <u>See</u> Rev. Proc. 90-38, 1990-2 C.B. 363, <u>amplifying, clarifying, and modifying</u> Rev. Proc. 89-67, 1989-2 C.B. 795, and succeeding revenue procedures. As previously mentioned, petitioner relied on Rev. Proc. 96-28, <u>supra</u>, when preparing the income tax returns for Mr. Johnson and Mr. Westling. The Court discussed the updated revenue procedure in its opinions. <u>See Johnson</u>

_____

[12]Attorneys Steven R. Stolar and Kristina S. Keller represented Mr. Johnson and Mr. Westling in their cases before the Court. It does not appear that petitioner is or was admitted to represent clients before the Court.

**[\*17]** <u>v. Commissioner</u>, 115 T.C. at 217-225; <u>Westling v. Commissioner</u>, 2000 WL 1310659, at \*2.

After the <u>Johnson</u> and <u>Westling</u> opinions the Commissioner continued to update these revenue procedures annually, but the relevant provisions remained substantially the same from 2000 to 2006. <u>See</u> Rev. Proc. 2000-39, 2000-2 C.B. 340; Rev. Proc. 2001-47, 2001-2 C.B. 332; Rev. Proc. 2002-63, 2002-2 C.B. 691; Rev. Proc. 2003-80, 2003-2 C.B. 1037; Rev. Proc. 2004-60, 2004-2 C.B. 682; Rev. Proc. 2005-10, 2005-1 C.B. 341; Rev. Proc. 2005-67, 2005-2 C.B. 729; Rev. Proc. 2006-41, 2006-2 C.B. 777.

As relevant here, for taxable years 2002 through 2006 these revenue procedures state the rules under the Code for deducting ordinary and necessary business expenses for meals incurred while traveling away from home (as set forth in sections 162 and 274(d) and the regulations) and then provide rules promulgated by the Commissioner for deducting "deemed substantiated" unreimbursed employee business travel expenses, including for meals, paid or incurred by employees. The revenue procedures include an option for the taxpayer to use the M&IE rate to calculate the deduction for meals and/or incidental expenses instead of substantiating the amounts paid or incurred. Petitioner read each revenue procedure on or shortly after its release.

[*18] B.     Chief Counsel Advice

In Chief Counsel Advice (CCA) 200242038 (Oct. 18, 2002), the IRS analyzed incidental expenses claimed by mariners, including the application of the Johnson and Westling cases to mariner taxpayers claiming deductions for meals and incidental expenses:

> The claims of mariners who claim either the full federal per diem amount (lodging plus meals and incidental expenses) or the full federal M&IE amount under the purported authority of Johnson and Westling are without merit.  The holdings in those cases limited the taxpayers to the federal per diem rate for incidental expenses only, using the rates specified in the Federal Travel Regulations.  Therefore, any amount claimed in excess of the IE rates in the Federal Travel Regulations is facially defective, and should be disallowed.

In CCA 200343025 (Oct. 24, 2003), the IRS analyzed the ramifications of the holding of the Johnson Opinion and addressed the following issues: (1) whether Notice 95-50, supra, affects the requirement to maintain records to substantiate a travel expense under section 274 and (2) deductibility of incidental expenses incurred while aboard a "ship in the middle of the ocean".  Regarding the Notice 95-50 issue, the IRS stated that Notice 95-50, supra, does not affect the substantiation requirements of section 274(d) that require a taxpayer to keep adequate records, prepared contemporaneously, to establish the amount, time,

[*19] place, and business purposes of expenditures. See CCA 200343025 (Oct. 24, 2003). Petitioner read each CCA shortly after it was released.

V.     Petitioner's Actions After the Johnson and Westling Cases

A.     Communications With Ric Hulshoff

On October 25, 2000, shortly after the release of the Johnson and Westling opinions, petitioner sent a letter to Ric Hulshoff, counsel for respondent in those cases, requesting a face-to-face meeting with Mr. Hulshoff "as the IRS's Legal Spokesman during these Tax Cases" and with "the L.A. Appeals Officers available to attend" to discuss the ramifications of the Johnson and Westling cases.[13]  The following is an excerpt from petitioner's letter to Mr. Hulshoff:

> My office has * * * spoken to most of the labor unions for merchant sailors who also predict several thousand amended tax returns could be requested of my office over the next year as a result of these decisions. * * *
>
> *          *          *          *          *          *          *
>
> I believe this requested meeting is needed to help both of us avoid unnecessary audit confrontations and unnecessary refund delays for taxpayers qualifying for these travel deductions.  We both realize that just because the Tax Court allowed me to use your Notice 95-50 (which states no travel receipts under $75 per incident is required) along with your various Travel Revenue Procedures (which also state these travel deductions are "deemed substantiated") does

---

[13]It is unclear from the record what communications, if any, petitioner had with Mr. Hulshoff before he sent the letter dated October 25, 2000.

**[*20]** not automatically mean every individual IRS Service Center Auditor or local IRS Office Auditor is going to immediately understand or comply with the Court's ruling.

I expect this face-to-face meeting will satisfy your Appeals Officers' concerns that I am indeed correctly applying the Tax Court's Interpretations of both IRS Notice 95-50 and your various Travel Revenue Procedures. I believe I can establish to your comfort level that I am now including a correct day-by-day breakdown for each sailor's travel showing the correct table-provided daily incidental rates along with an employer letter stating no per diem allowances were provided.

After receipt of this letter Mr. Hulshoff telephoned petitioner and during a brief conversation informed him that it was against IRS policy to meet with an interested party after a Tax Court case. Petitioner sent a similar letter dated November 22, 2000, repeating his request for a face-to-face meeting to discuss the Johnson and Westling cases. Petitioner did not specifically mention claiming meals expense deductions for his mariner clients in either letter to Mr. Hulshoff. After this second letter Mr. Hulshoff again telephoned petitioner and informed him that the IRS would not conduct such a meeting with him.

B. Communications With Mariner Clients

After the Johnson and Westling opinions were released, petitioner began advising his tugboat mariner clients and some of his other mariner clients that they

[*21] were allowed to claim meals expense deductions even if meals were provided by their employers.

### C. Websites

In 2001 petitioner created websites at www.mkappcpa.com and www.sailortax.com (which redirected to www.mkappcpa.com) that advertised and promoted his services to mariners by asserting that he could obtain large income tax refunds for them. In these representations petitioner discussed the Johnson and Westling cases, asserting that he successfully sued the IRS in the Tax Court

[*22] and won "his cases".[14] Petitioner continued to maintain these websites

through 2007.

Sometime before February 2004 a document titled "Article Available on

More Favorable Mariner Tax Treatment" was posted on petitioner's websites.

This document asserted that petitioner had "won a tax court ruling that can result

in more beneficial tax treatment to merchant mariners" and that the average tax

savings for mariner taxpayers "has been between $2,000 and $2,500".

---

[14]Petitioner referred to Johnson v. Commissioner, 115 T.C. 210 (2000), and
Westling v. Commissioner, T.C. Memo. 2000-289, as "my" decisions in multiple
internet posts.  In a post entitled "What do Merchant Sailors Need to Provide Us to
Get These Rather Large Travel Deductions?", petitioner wrote:

> The Tax Court was very clear in both of my decisions to
> properly take full advantage of these "deemed substantiated" travel
> deductions, my office needs a full-year "Ports of Call Statement"
> * * * In any case, a Sea Time Letter generated by your employer (or
> possibly generated by the Ship's Captain) showing the specific days
> worked and the specific vessel you worked aboard is the only other
> item required to claim these wonderful travel deductions.
> Remember--these were the only items of "proof" that I showed the
> Tax Court with Jim Westling's case * * *

In a series of bullet points in the same post stating his professional background,
petitioner claimed to have "[s]uccessfully [s]ued IRS in U.S. Tax Court using this
Rev. Proc. and the other 'Deemed Substantiated' Travel Rev Proc's on behalf of
both Marin I. Johnson 115 T.C. 16 and Jim L. Westling T.C. Memo. 2000-289".
In a separate post entitled "What About Tug Boat/Barge Mariners?", petitioner
stated:  "My first article in the October/November 2001 issue of 'Professional
Mariner' Magazine describes in considerable detail why I won twice in Tax
Court".

**[\*23]** D.    <u>Articles</u>

After the <u>Johnson</u> and <u>Westling</u> cases, petitioner wrote and published several articles discussing the application of these cases to mariner taxpayers, including the following.

Petitioner's magazine article titled "Tax breaks for mariners" was published in the October/November 2001 edition of Professional Mariner magazine and was available on Professional Mariner Online (the website for Professional Mariner magazine).  In a discussion of the impact of the <u>Johnson</u> and <u>Westling</u> cases on the income tax deductions available to mariners, petitioner wrote:

> [T]he exciting news for mariners is that two U.S. Tax Court decisions last year settled the legal issue of allowing mariners to claim an almost unlimited amount of travel deductions while working away from home, without ever having to show the IRS any receipts, just like other transportation workers.
>
> \*      \*      \*      \*      \*      \*      \*
>
> Before these cases, the legal issue of mariners claiming travel deductions while underway had not been discussed in any Tax Court cases prior to World War I, and <u>the conventional wisdom was that sailors could not claim travel expenses since meals and lodging are provided at no cost.</u> \* \* \*
>
> \*      \*      \*      \*      \*      \*      \*
>
> The Tax Court's 30-page Johnson decision left no room for doubt that every qualified mariner can claim incidental expenses by using the published incidental rates, and they can also claim other legitimate

[*24] travel deductions without having to keep any receipts for expenses under $75 per IRS Notice 95-50. To make these two court victories even sweeter, IRS management has formally agreed to comply fully and follow these Tax Court decisions. No longer can an individual IRS auditor decide to challenge these court decisions and demand to see travel receipts from anyone.

\* \* \* \* \* \* \*

The Tax Court also specifically allowed my sea captains to claim all of their time aboard the ships, not just the days they spent in port. The court also agreed that these travel deductions have been legally available since 1927 when Congress first allowed travel incidental deductions.
[Emphasis added.]

Petitioner's magazine article titled "Tug & Barge Sailors Entitled to Tax Deductions for Food" was published in the April/May 2002 edition of Professional Mariner magazine. In a discussion of deductions for meals and incidental expenses available to tugboat mariners, petitioner asserted:

While the thrust of my recent article \* \* \* dealt with sailors working aboard oceangoing containerships, where all lodging and meals were assumed to be completely provided, tug and barge sailors are commonly provided a food allowance for the boat that may average only $10 per day.

In 2000 the U.S. Tax Court in Washington ruled in behalf of two of my clients, Capt. Marin Johnson and Capt. Jim Westling, over the issue of mariners claiming automatic travel deductions without receipts while underway. Please remember both the IRS and the Tax Court now allow travel deductions per my two Tax Court decisions covering any unreimbursed lodging, meals and/or incidental expenses. If meals are not routinely provided at the full IRS meal

[*25] rate, you are allowed to claim this meal rate for each port you visit. This "deemed substantiated" meal rate fluctuates from city to city.

\* \* \* \* \* \* \*

> For tax purposes, the situation of sailors receiving a $10-a-day cash food allowance is not legally equivalent to those "having their meals provided by their employer."
>
> Other sailors must shop for their entire crew's groceries at a specific supermarket with a company-provided food voucher and are given the same $10-per day food allowance per sailor. In both of these scenarios, you may claim the full, daily, government-allowed meal rate, less your per diem allowance. For example, if you are working in New York Harbor and receive a $10-per-day food allowance, you are allowed to claim $46 (New York rate) minus $10. That equals $36 per working day.
> [Emphasis added.]

Petitioner also asserted that mariner taxpayers claiming these deductions could expect to decrease their tax liability by $2,000 to $3,000.

Petitioner's magazine article titled "Transportation industry tax savings: special tax benefits for pilots and mariners" was published on August 1, 2002, in The National Public Accountant magazine. Petitioner discussed the <u>Johnson</u> and <u>Westling</u> cases, writing:

> [T]he U.S. Tax court settled the legal issue of allowing mariners to claim an almost unlimited amount of travel deductions while working away from home, without having to produce any receipts, the same as for other transportation workers. <u>Previously, conventional wisdom was that sailors could not claim travel expenses since meals and</u>

[*26] <u>lodging are provided at no cost.</u>  We proved that the law allows a travel deduction for lodging, meals, and/or incidental expenses.

\*      \*      \*      \*      \*      \*      \*

The Tax Court's decision left no room for doubt that every qualified mariner can claim incidental expenses by using the published incidental rates.  They also can claim other legitimate travel deductions without having to keep any receipts for expenses under $75 per IRS Notice 95-50.
[Emphasis added.]

Petitioner's article titled "Beware of magic numbers when tabulating your tax deductions" was published in the February/March 2003 edition of Professional Mariner magazine and was available on Professional Mariner Online.  In a discussion about deductions for meals and incidental expenses available to mariner taxpayers on their Federal income tax returns he wrote:

$38 per day is the standard domestic (continental United States) transportation meal rate.  This $38 per-day meal rate is only legally available to tug/barge sailors and is not available to deep-ocean sailors.  <u>Oceangoing sailors typically have their meals provided by their employers</u>, while tug/barge sailors typically receive only a $8 to $11 per-day grocery allowance.  Oceangoing sailors can claim more than $38 per day easily, but this $38 rate is for meals, and deep-ocean sailors qualify for incidental expenses, not meals.

\*      \*      \*      \*      \*      \*      \*

<u>Oceangoing sailors--remember your meals are normally provided, and claiming this additional meal deduction is considered to be double dipping.</u>

**[\*27]** \*         \*         \*         \*         \*         \*         \*

     Besides, tug/barge sailors using this $38 rate still need to reduce this figure by the $8 or $11 daily grocery allowance provided by their employers.

\*         \*         \*         \*         \*         \*         \*

There is no set limit as to the amount of claimed travel deductions-- but only if you properly attach travel documents that clearly establish your specific travel dates and specific travel locations.  Both deep- ocean and tug/barge sailors that use my office to compute their qualified travel deductions seem to be averaging between $40 and $60 per day, without receipts.
     [Emphasis added.]

E.    <u>Documents Created for Mariner Clients</u>

In late 2001 or 2002 petitioner wrote a document titled "What Do Merchant Sailors Need to Provide Us to Get These Rather Large Travel Deductions" that was provided to clients.[15]  In this document petitioner asserts:

     The Tax Court was very clear in both of my decisions to properly take full advantage of these "deemed substantiated" travel deductions, my office needs a full-year "Ports of Call Statement" hopefully signed and/or stamped by the Ship's Captain.  This "Ports of Call Statement" needs shows [sic] **All Ports Visited By The Ship During the Entire Year--Port Arrived Date--Port Departed Date**.  If your ship visited more than one port in a day--just choose one (hopefully the one with the higher per diem rate).  Try also to make this Statement look as "Official" as possible.  My office will then

---

[15]It appears that this document was mailed to some clients, and it also may have been posted on petitioner's websites.

[*28] attach a copy of this statement to each and every sailor's return we process from your ship.

In any case, a Sea Time Letter generated by your employer (or possibly generated by the Ship's Captain) showing the specific days worked and the specific vessel you worked aboard is the only other item required to claim these wonderful travel deductions. Remember--these were the only items of "proof" that I showed the Tax Court with Jim Westling's case, and Jim is a Tug Boat Captain and did not have any U.S. Coast Guard Discharge Papers.

In April or May 2002[16] petitioner wrote a document titled "What about tugboat/barge mariners?" in which he discussed the implication of the <u>Johnson</u> and <u>Westling</u> opinions on the tax returns of tugboat/barge mariners. Petitioner wrote:

Please remember <u>both</u> the IRS & the U.S. Tax Court allow travel deductions covering any unreimbursed lodging, meals, and/or incidental expenses. If meals are not routinely provided, you are allowed to claim the full meal rate for the location of travel. * * *

**For tax purposes, any employee who is either directly or indirectly given a $10/day cash food allowance is not legally equivalent to "having their meals provided by their employer."** * * *

\* \* \* \* \* \* \*

The combination of winning twice in U.S. Tax Court the legal right for all qualifying merchant sailors to claim an almost unlimited

---

[16]The document states: "**Be sure to read my followup article now appearing in the current April/May 2002 'Professional Mariner' magazine specifically dealing with tug & barge sailors!**"

[*29] amount of travel deductions all without receipts and my two recently published articles in "Professional Mariner Magazine" is causing a large increase in new business to my accounting firm.  * * *

*      *      *      *      *      *      *

**And Yes, these "deemed substantiated" travel deductions also apply to those sailors working in the Great Lakes Area, all inland waterways, those servicing Gulf Coast oil rigs, in addition to those working in deep water.**

VI.     Marine Company Industry Practices

A.     Cheramie Marine

At least one of petitioner's mariner clients[17] worked for Cheramie Marine during the years in issue.  Cheramie Marine is a shipping company that hauls supplies, fuel, water, groceries, and incidentals to offshore drilling rigs and production platforms in the Gulf of Mexico.  During the years in issue Cheramie Marine employed between 40 and 60 mariners and operated approximately 10 vessels:  three crew boats and seven supply vessels.  Each vessel carried four crewmembers who each worked a shift lasting 28 days.

---

[17]In August 2007 petitioner provided the U.S. Department of Justice (DOJ) and the U.S. District Court for the Central District of California with a list of each client for whom he had prepared an income tax return or portion of a return which asserted or relied "on a position that mariners may claim tax deductions for meals that were provided to them without cost" (client list).  We will discuss the client list in further detail infra p. 62.

**[\*30]** While the crew was aboard the vessel, a crewmember would prepare and serve to the crew three meals a day (breakfast, lunch, and dinner) and would also make meals available for those who worked nighttime shifts. Every 28 days when a vessel made a crew change, the crew would compile a list of groceries and submit it to the Cheramie Marine main office, which ordered the groceries and paid the grocery store. During the relevant years Cheramie Marine had a grocery budget of approximately $250 per vessel per week. Cheramie Marine did not charge employees for groceries or meals.

From 1977 to 1992 Dino Cheramie worked for a crew boat company jointly owned and operated by his father and brother before founding Cheramie Marine in 1992, where he served as the chief executive officer. According to Mr. Cheramie, providing meals to mariners has been "a standard procedure" in the marine industry since at least 1977 when he started his career. At the time of trial Mr. Cheramie was not aware of any marine company that did not provide free meals to mariners while they were working aboard a vessel.

**[\*31]** B.    Matson Navigation Co.

At least two of petitioner's clients[18] worked for Matson Navigation Co. (Matson) during the years in issue.  Matson is a steamship company that has routes from Washington State to California and to Hawaii and has a service that provides travel to China.  From 2002 to 2006 Matson operated between 12 and 16 vessels, including steamships and diesel vessels.  Each vessel carried between 20 and 35 crewmembers.  The lengths of the routes for Matson's vessels varied depending on their destinations.  For example, the voyage on the Hawaii route lasted two weeks, while the voyage on the China route lasted 35 days.  While the vessels were at sea, the mariners could not leave the ship.  Additionally, when a vessel arrived in port, the mariners aboard were not allowed to leave the ship until 5 p.m. or 6 p.m.

Each of Matson's vessels had a galley kitchen in which meals were prepared for employees.  The steward's department for each vessel was in charge of meals. The chief steward prepared the meal plans and a grocery list, and Matson ordered and paid for the groceries.  The steward's department then prepared these groceries for meals.  Each vessel provided employees aboard with three meals a

---

[18]Petitioner's client Raymond Zbylut worked for Matson during 2002. Petitioner prepared Mr. Zbylut's income tax return for 2002.  We discuss Mr. Zbylut's case before the Court infra pp. 69-71.  Zbylut v. Commissioner, T.C. Memo. 2008-44.

[*32] day (breakfast, lunch, and dinner) and kept food in the refrigerator overnight for those who had to work late or worked the night shift. Union contracts dictated the types of food that Matson could serve to employees and also dictated that Matson had to provide at least three food options at each meal. Meals were served buffet style, and there was no limit as to how much an employee could eat. Matson did not charge employees for the groceries or the prepared meals, and the value of meals was not included in Forms W-2, Wage and Tax Statement, provided to employees.

Donna Simon Schlanker was the payroll manager during the relevant years, a position she held for approximately 16 years. At the time of trial Ms. Schlanker was the purchasing manager and had worked for Matson for 23 years. She was not aware of any marine shipping company that did not provide free meals to mariners while they were working.

C.    Dann Ocean Towing

At least one of petitioner's clients worked for Dann Ocean Towing (Dann) during the years in issue. Dann is a family-owned tugboat company that tows vessels, including barges and ships, along the east and west coasts of the United States and the Gulf of Mexico and occasionally to foreign countries. During 2002

**[*33]** through 2006 Dann operated seven or eight tugboats and employed between 60 and 80 mariners.

Mariners were typically on work schedule rotations that had them aboard the tugboat for 40 days and then off for 20 days, although some would choose to extend and stay for longer periods. While mariners were on these rotations, they were generally required to stay aboard the vessel.

Each Dann tugboat had a galley kitchen or a similar space in which meals were prepared which was equipped with a stove, a range, a microwave, a refrigerator, a freezer, and a storage space for dry goods. Each Dann tugboat also had a dining area for the employees. The procedure for meal preparation for each voyage was that one mariner was designated the cook and would take inventory of the food in the kitchen and then make a list of groceries for the voyage. After the captain or mate reviewed and approved the grocery list, the cook would purchase the groceries for the voyage. The cook prepared all meals and provided them to mariners while they were aboard the tugboat. Dann paid for the groceries and did not charge employees for groceries or the meals provided.

Mr. Waller was the general manager for Dann during the relevant years. According to Mr. Waller, providing meals to mariners aboard the tugboat is "the normal policy of the way we've been doing business ever since I've been

[*34] employed there. We provide the food for the crew members while they're onboard." At the time of trial Mr. Waller had worked for Dann for almost 23 years.

D. Mariner Edward Roach

Edward Roach was petitioner's client during the years in issue and worked for Central Gulf during taxable years 2004, 2005, and 2006. Mr. Roach attended and graduated from the Massachusetts Maritime Academy. In 1967 he began working as a seaman and then became an officer and licensed merchant mariner in 1968.

Mr. Roach worked as a mariner in various positions for approximately 10 companies over 40 years, first as third mate, then second mate, then chief mate, then briefly as captain, and then finally as chief mate before retiring in approximately 2008. He worked on a tugboat for 10 years. He also worked on a number of other types of vessels during his career, including freight bulk ships, container ships, tankers, passenger cargo ships of various sizes, and bulk vessels. At the time of trial Mr. Roach was performing some work as a consultant for the merchant mariner industry.

Throughout his career as a mariner Mr. Roach would stay on the ship for periods of one to six months. On each vessel on which Mr. Roach worked there

[*35] was a galley where food was prepared by his employer's steward's department, and three meals were served a day (breakfast, lunch, and dinner). Additionally, food was usually left in the refrigerators and available for people who worked through the night shift or who otherwise wanted to eat late at night or early in the morning. Meals were provided "all the time * * * in port or at sea". All of Mr. Roach's employers paid for the groceries used in preparing the meals, and they did not charge him for groceries or the meals served aboard the vessel. Additionally, Mr. Roach had "never heard of any" marine company that did not provide free meals to its employees while they were working aboard a vessel.

During the relevant years when Mr. Roach's vessel was in port he "normally stayed onboard" and would eat the meals provided by his employer. Mr. Roach did not pay meal expenses while working aboard a vessel at any time during the relevant years when the vessel was at sea or in port.

E. Edison Chouest Offshore (ECO)

At least one of petitioner's mariner clients worked for ECO during the years in issue. ECO provides supply vessels for offshore oil and gas drilling, operating mainly in the Gulf of Mexico and Louisiana. During the relevant years ECO operated approximately 150 vessels and employed approximately 3,500 mariners. The typical schedule for a mariner was to be aboard the vessel for 28 days, during

[*36] which time they were generally required to stay aboard the vessel, and then they were off the vessel for 14 days.

During 2002 through 2006 ECO provided meals for all its mariner employees while they were aboard the vessels. ECO had a grocery budget of $8.50 per day per employee per vessel; this budget determined how much each ECO vessel could spend on groceries for a voyage. Each ECO vessel had a kitchen and a cook who prepared and served three meals per day (breakfast, lunch, and dinner) to all of its mariner employees while they were working. Each ECO employee could eat as much as he desired during a meal. The captain and/or the cook of a vessel would select groceries that were used to prepare the meals, and the grocery store would send the invoices directly to ECO for payment. ECO paid for all of the groceries and did not charge its employees for the groceries or for the meals.

VII.   Petitioner's Conversations With Charles Comeaux

Charles Comeaux is a C.P.A. and was the chief financial officer (CFO) for ECO during the years in issue. At the time of trial Mr. Comeaux had worked for ECO for 35 years and was its CFO for 27 years. As CFO Mr. Comeaux managed ECO's accounting department in addition to working on its finances and tax planning.

[*37] Mr. Comeaux first heard of petitioner in approximately 2002 when an ECO employee informed him that petitioner was preparing income tax returns for mariners and claiming deductions for meal expenses. Mr. Comeaux told the ECO employee that he believed that the deduction was improper. Petitioner subsequently called Mr. Comeaux a few times requesting a list of ECO's mariner employees, which Mr. Comeaux refused to provide.

During these telephone conversations Mr. Comeaux explained to petitioner that he believed it was improper for ECO employees to claim deductions for meal expenses because ECO provided all employees with meals, at no charge, while they were working. Mr. Comeaux then consulted with ECO's tax professional, a tax partner with the accounting firm Ernst & Young LLP (E&Y), who agreed with Mr. Comeaux that these deductions were improper. Subsequently, Mr. Comeaux and the E&Y tax partner had a telephone conference with petitioner, during which they explained to him why they believed that the above-mentioned deductions were improper. During these telephone conversations petitioner was aware of the E&Y tax partner's credentials and that Mr. Comeaux was ECO's CFO and a C.P.A.

**[*38]** VIII. <u>Petitioner's Income Tax Return Preparation Practices for Years in Issue</u>

As previously mentioned (1) approximately three-fourths of petitioner's clients were mariners, and he prepared income tax returns for mariner taxpayers for taxable years 2002 through 2006 and (2) after the <u>Johnson</u> and <u>Westling</u> opinions were released in 2000, petitioner began advising his tugboat mariner clients and some of his other mariner clients that they were allowed to claim deductions for meal expenses even if meals were provided by their employers.

A. <u>Income Tax Return Preparation Practices Generally</u>

When preparing income tax returns for his mariner clients, petitioner did not question each mariner client about whether his or her employer provided meals while he or she was working. Petitioner did not meet all of his mariner clients in person before signing their income tax returns. Petitioner did not have a document reflecting the meal policy for each company that employed his mariner clients. Petitioner also did not keep a written record of the meal policies of the companies employing his mariner clients, nor did he have a record of any companies that purportedly did not provide their mariner employees with meals while working.

[*39] B.     <u>Supplemental Sailor Travel Schedules</u>

For the years in issue petitioner prepared income tax returns for clients that claimed deductions on Schedule A, Itemized Deductions.  For at least some of his mariner clients petitioner attached to their income tax returns a statement variously titled "Supplemental Sailor Travel Schedule" or "Supplemental Tug/Barge Sailor Travel Schedule" (travel schedule or travel package).  <u>See</u> <u>infra</u> Appendix A. These travel schedules included, among other things, a calculation of the deduction claimed on Schedule A, line 20, Unreimbursed employee expenses--job travel, union dues, job education, etc., computed using the number of days the vessel was traveling, the location(s) of travel of that vessel, and the applicable OCONUS and CONUS[19] M&IE rates for each location.  The travel schedules contained the following sentence (or a substantially similar sentence) in their first body paragraph:  "This travel package format was completed in conjunction with the CPA firm that prevailed with both Marin Johnson ('Johnson') Jim Westling [sic] T.C. Memo. 2000-289 ('Westling') Tax Court Mariner decisions discussed below".  At least some of the travel schedules also contained the following or a

---

[19]OCONUS is an acronym for "outside the continental United States", and CONUS is an acronym for "continental United States".

**[\*40]** similar assertion: "This travel package format has already been legally endorsed by the U.S. Tax Court in Washington D.C." See infra Appendix A.

Petitioner typically attached additional documents in support of the travel schedule, including (1) the "Ports of Call" travel schedule for the vessel(s) on which the taxpayer worked and traveled during the year and (2) documents from the U.S. Coast Guard reflecting the taxpayer's travel while aboard the vessel(s) during the year. Petitioner also attached authorities which he asserted supported his position, including a copy of the Johnson Opinion and a copy of the relevant revenue procedure for the year in issue.

Petitioner provided two types of services for a mariner client: (1) preparing the entire Federal income tax return, including the travel schedule, or (2) preparing only the travel schedule. Petitioner provided the latter service for approximately 3% of his clients. Petitioner typically charged a mariner client $595 to prepare an income tax return and $295 to prepare a travel schedule.

C.     Mr. Roach's Income Tax Returns for 2004 Through 2006

Mr. Roach learned of petitioner's income tax return preparation services through his articles in mariner magazines and an article written for his union newspaper and was aware of him because he was well known among mariners for "soliciting tax preparation for seamen for a while." Mr. Roach was initially

[*41] skeptical that he could deduct meal expenses because he had "never paid for any meals on any ships in 40-something years", but he was eventually convinced that the meal expense deduction was legitimate after reading some of petitioner's articles and other materials in which he asserted that he had won the <u>Johnson</u> and <u>Westling</u> cases. Mr. Roach contacted petitioner's office in 2004 or 2005 and hired petitioner to prepare his 2004 income tax return.

Petitioner prepared and timely filed Mr. Roach's individual income tax returns for taxable years 2004, 2005, and 2006. While these returns were being prepared Mr. Roach "never had a conversation" with petitioner; instead, one of petitioner's employees would ask Mr. Roach questions and request paperwork. While his returns for the relevant years were being prepared, Mr. Roach called petitioner's office several times and would "get as far as his secretary", who would then refer him to one of petitioner's employees. Mr. Roach was not allowed to speak with petitioner. It does not appear that petitioner's employees questioned Mr. Roach about whether he paid for meals while working aboard the vessel during the relevant years.

Mr. Roach's income tax returns for the years 2004, 2005, and 2006 claimed deductions for meals and incidental expenses (computed using the full M&IE rate on the basis of locations of travel) on Schedule A, line 20, of $4,014, $4,126, and

[*42] $4,484, respectively. These amounts included meal expenses while Mr. Roach was at sea and when his vessel was in port. For each of these years Mr. Roach was subject to the alternative minimum tax (AMT).

IX.    The IRS Investigation

A.    Examining Officer Tiffany Sim

In November 2003 Examining Officer (EO) Tiffany Sim sent a letter to petitioner informing him that he was the target of an IRS investigation for "tax shelter promotion" and requesting to schedule an appointment. On December 1, 2003, petitioner called EO Sim to discuss the investigation. Also on December 1, 2003, petitioner sent a nine-page letter to EO Sim in which he asserted that he wants to provide "legal background into these travel deductions" and stated that his position on the so-called mariner tax deduction (MTD) is supported by the relevant authorities and the Tax Court and that the IRS does not oppose his position. In the same letter, he acknowledged receipt of EO Sim's letter dated November 21, 2003, and wrote:

> After reading the above quotes taken from your 15 Travel Revenue Procedures, Notice 95-50, your Travel Publication 463, and my two U.S. Tax Court decisions it is easy to understand why some other tax preparers throughout the country may be claiming excessive travel deductions for their 'Transportation Industry Employees.' But not me. * * * Every sailor return I prepare requires the compilation and attachment of between 40 and 150 pages of Court Required

**[\*43]** documentation.  The manual preparation time required to put all of this paperwork together could take someone 30 to 40 hours just to put together one tax return.  Whenever I receive either emails or phone calls from other preparers or sailors I stress upon them the legal requirement to properly substantiate their travel claims.  I personally have heard several tax preparers tell me they routinely just slap a large travel claim onto a Schedule 2106 without ever bothering to follow the substantiation requirements established by my two Tax Court decisions. * * *

\*        \*        \*        \*        \*        \*        \*

I believe this letter and attachments should be sufficient to relieve you of any concerns about my tax practice being involved with 'Tax Shelter Schemes.'  I am not.  As I have indicated in this letter, both the U.S. Tax Court and your agency agreed with my legal logic.  **I find it very ironic that someone like myself who has proved themselves twice in Tax Court with out <u>any</u> legal objections from the IRS, and who has always followed the documentation policy approved by the Tax Court, should now be subjected to your agency's intimidating harassment.**

Subsequently, petitioner hired a Los Angeles based tax attorney (petitioner's LA attorney) to represent him during the IRS investigation.

On February 26, 2004, EO Sim interviewed petitioner, asking a number of questions about (1) his personal history, business, and professional history, (2) his business practices and the size of his business, and (3) the promotional documents he distributed for his business.  During the interview petitioner declined to answer the following questions:  "Have you sought advice from a tax attorney, a CPA,

**[*44]** and/or an Enrolled Agent, regarding tax issues of any of your products or clients? If so who, with whom have you consulted?"

Petitioner prepared a letter titled "Why is IRS Harassing Me for Twice Winning in U.S. Tax Court?" addressed to EO Sim and others dated March 2, 2004, as a followup to the February 26 interview and to discuss the IRS investigation. Petitioner referenced and included text almost identical to that used in his December 1, 2003, letter:

> As I have indicated in both letters, both the U.S. Tax Court and your agency agreed with my tax logic and legal authority. **I find it very ironic that someone like me who has proved himself correct twice in Tax Court openly stated the IRS lost on <u>every</u> <u>legal</u> <u>issue</u>, I should now be subjected to this type of IRS' intimidating harassment.**

B.     <u>Revenue Agent George Campos</u>

In May 2004 the IRS investigation was assigned to Revenue Agent (RA) George Campos, who investigates tax promoters and abusive tax return preparers. RA Campos met with petitioner and/or petitioner's LA attorney several times during 2004. Petitioner provided copies of sample returns, travel schedules, client files, and a client list. During a meeting with RA Campos in August 2004 petitioner asserted that "he had asked some of his taxpayers, namely like the captain" whether they were provided meals aboard the ship, and "they had told

[*45] him * * * that they did not provide any meals." When RA Campos inquired whether petitioner had questioned his mariner clients' employers about whether meals were provided at no charge, petitioner asserted that "no, he didn't need to do that because he trusted his taxpayers, what they were telling him."

After performing research and reviewing the information and files provided by petitioner, on January 10, 2005, RA Campos left a voicemail message for petitioner's LA attorney informing him that petitioner was still under investigation. Petitioner prepared a letter addressed to RA Campos dated February 14, 2005, about the ongoing IRS investigation. Petitioner discussed his "legal understanding" of the Johnson and Westling opinions, the relevant revenue procedures, and Notice 95-50, supra. Petitioner asserted among other things, "I have prevailed twice in Tax Court without the IRS offering any opposing arguments to my presented legal understanding of federally allowed travel deductions". Petitioner also responded to RA Campos' "concern that you found no written documentation in my client files as to my inquiry with my mariner clients into their incurred incidental travel expenses", asserting that although his office questions mariner clients about their incidental expenses, "[t]here is nothing in the law that requires me to write down every single aspect of an oral

[*46] conversation between my office and my clients." It is unclear from the record whether petitioner sent this letter to RA Campos.[20]

In March 2005 RA Campos held a meeting with petitioner and petitioner's LA attorney, during which RA Campos informed them that he had contacted a number of shipping companies, all of which had stated that the companies provide all meals at no cost to their mariner employees while they are working. During this meeting RA Campos explained to petitioner why his argument about tugboat mariners receiving a grocery allowance[21] was incorrect and informed petitioner that an expense that was not paid or incurred may not be deducted and thus was not allowed under the Code. During this meeting petitioner also asserted that under 46 U.S.C. sec. 10303 (2000), meals provided to mariners must "total at least 3100 calories/day" and be nutritionally balanced. According to petitioner, since the purported $8 to $10 per day grocery allowance is not sufficient to meet these requirements, "the food provided is not considered a meal" for tax purposes. RA

---

[20]In September 2006 petitioner testified that he could not recall whether he had sent the letter and that "sometimes what I will do is I will draft letters and not send them because new information comes to light".

[21]This refers to petitioner's position, as reflected in his aforementioned articles, that tugboat mariners receive a grocery allowance and that they can deduct as meal and incidental expenses the difference between the M&IE rate and the purported grocery allowance.

**[*47]** Campos explained to petitioner that there is no reference in the Code to a calorie requirement or nutritional value in deciding whether an employer has provided meals to an employee.

Petitioner's LA attorney prepared an 11-page letter to RA Campos, signed and dated May 2, 2005, asserting petitioner's good-faith belief that the positions petitioner recommended to his tax return clients were correct and based on his reasonable understanding of the applicable law. This letter also states the reasons petitioner should not be the subject of any penalties or proceedings under sections 6700 and 6701, as follows:

> Mr. Kapp maintains that barge and/or tugboat mariners are entitled to the difference between the value of whatever food was provided and the standard Federal per diem rate for meals and incidentals expenses ("M&IE") rate.
>
> *     *     *     *     *     *     *
>
> We are not aware of any Court opinions explicitly rejecting Mr. Kapp's position (neither Johnson nor Westling directly addresses this issue in their holdings and any statements in the Courts' opinions that seem to speak on this issue are, at best, non-binding dicta of the Tax Court), and this issue of whether barge and tugboat mariners are entitled to deduct the difference between the value of meals provided and the standard M&IE remains unaddressed in all other federal case law.

Petitioner's LA attorney also asserted, among other things, that before publishing one of his articles in Professional Mariner magazine, petitioner sent a copy of this

[*48] letter to Mr. Stolar, who "was quite familiar with the mariner travel deduction area, since he was the attorney who successfully litigated the Johnson and Westling decisions. Mr. Stolar reviewed the article and agreed with its content. He also suggested to * * * forward a copy of the article to IRS National Office." Petitioner reviewed and approved this letter before it was sent to RA Campos. RA Campos received and read this letter.

On May 24, 2005,[22] petitioner's LA attorney sent another letter to RA Campos regarding petitioner's case. He wrote:

> Last Wednesday, May 18, 2005 I had a telephone conversation with IRS Counsel * * * concerning Mr. Kapp's case. We briefly discussed the facts and circumstances * * *
>
> I also told * * * [IRS Counsel] that although Mr. Kapp does not necessarily agree with the position you articulated for the first time at our meeting last month, regarding meals deductions for mariners on tugboats and barges, he has agreed to cease claiming meal deductions as he has done previously, pursuant to his good faith understanding of the law.

RA Campos received and read this letter but did not respond to it in writing; instead he responded to petitioner's LA attorney orally.

---

[22]The parties stipulated another letter dated July 27, 2005. The July 27 letter is nearly identical to the May 24 letter except for the date. The parties did not clarify why petitioner's LA attorney would send another version of the May 24 letter or whether he actually sent the July 27 letter.

[*49] Subsequently petitioner's LA attorney requested a meeting with RA Campos, asserting that petitioner was going to stop preparing income tax returns for mariner taxpayers claiming deductions for meal expenses. RA Campos and petitioner's LA attorney met on June 23, 2005, and during this meeting petitioner's LA attorney "asked if it's possible that we can handle this quietly and * * * if we [the IRS] interview one of his clients * * * just interview one of them". RA Campos would not agree to these requests. Petitioner's LA attorney sent RA Campos a followup letter dated June 24, 2005, summarizing the meeting, in which he states:

> During the meeting you stated that the government believes a position Mr. Kapp is taking on returns he prepares for tugboat and barge mariners is incorrect. * * * You further stated that Mr. Kapp has "promoted" this position through various activities, including statements on his website. As I have previously informed you, Mr. Kapp has reviewed his website since learning of the investigation and made substantial changes to it. We believe the website, as it is currently constituted, gives a fair and accurate depiction of the tax issues affecting tugboat and barge mariners.

> If, however, the Internal Revenue Service believes that Mr. Kapp should make additional changes to his website, please call me to discuss these changes. Mr. Kapp wants to make sure that his website is accurate in every way.

On August 12, 2005, RA Campos and his manager Ruth Huberman held a meeting with petitioner. During this meeting petitioner reasserted his positions

**[*50]** that (1) tugboat mariners who receive a grocery allowance should be allowed to deduct the difference between the M&IE rate and the grocery allowance and (2) the purported grocery allowance does not provide mariners with 3,100 calories per day and is not a qualifying meal for tax purposes. RA Campos again explained that a taxpayer could not deduct an expense not paid or incurred and that a calorie requirement was not a consideration in deciding whether meals were provided by an employer. During this meeting petitioner asserted that "it doesn't matter if * * * [mariners] receive a meal or not, they're still entitled to a deduction."

On August 12, 2005, petitioner sent a letter to RA Campos titled "Post 8-12-05 Meeting Letter". Petitioner discussed his conversation with RA Campos in the letter, asserting among other things that during the meeting

> I also told you that I had stopped claiming meal deductions since late March awaiting further guidance from your office.
>
> *     *     *     *     *     *     *
>
> With you [sic] statement to me that you now understand why I am claiming meals for merchant sailors, I can only assume that you [are] now more comfortable with me claiming meals for mariners. If I am misunderstanding that you are now comfortable with me claiming meals for mariners, send me a written response. Without a written response by August 25th, I will assume all is now OK and will start claiming meals again for my mariners.

**[*51]** The August 2005 meeting was the last meeting between RA Campos and petitioner for the investigation.

RA Campos concluded that petitioner should be enjoined from claiming meal deductions for his mariner clients. RA Campos prepared a written injunction referral dated December 20, 2005, in which he discussed the background of petitioner's case, his research and various discussions with petitioner, petitioner's "legal logic" for his positions, and petitioner's inability to provide support for his positions. RA Campos wrote that petitioner "relied on oral testimony from his mariner clients who told him that they did not consider the food provided as meals. Mr. Kapp, however, stated that he failed to contact the shipping companies and inquire as to the industry practice of grocery allowance." Under the section "Harm to Government", RA Campos wrote that petitioner "continues to actively participate in the preparation of federal tax returns that falsely claim the mariner's deduction which leads to either an overstated refund or substantially reduced tax liability." RA Campos also wrote that petitioner "continues to express his belief that his method and his interpretation of the tax code is correct and continued to prepare returns * * * as usual, even though he was explained the position of the IRS before the 2004 filing due date (4/15/05) and 'had agreed to cease claiming meal deductions as he had done previously'".

[*52] C.    Draft Interoffice Memorandum

In 2005 an associate at the firm of petitioner's LA attorney wrote a 12-page draft interoffice memorandum dated April 18, 2005, addressed to petitioner's LA attorney, summarizing his "preliminary thoughts."  The associate analyzed petitioner's position on meal deductions for mariners, reviewed the sources cited by petitioner and RA Campos, and systematically explained why petitioner's positions were not supportable by caselaw or IRS administrative sources.

The following is an excerpt from the associate's draft interoffice memorandum:

> I * * * have concluded that the IRS pronouncements cited by Mr. Campos support his conclusion, but little if any authority relied upon by Mr. Kapp supports the position he takes.  The central problem these mariners face is that there is no evidence that they incurred or reasonable [sic] expected to incur expenses for their own meals while aboard the vessel, therefore they cannot benefit from the Revenue Procedures deeming certain expenses substantiated.
>
> *         *         *         *         *         *         *
>
> Although the Court does not explicitly say so, a fair reading of Johnson is that the Court denied the meal deduction portion of the M&IE rate, because meals were provided * * *
>
> *         *         *         *         *         *         *
>
> Lastly, a plain reading of Rev. Proc. 2004-60 leads me to the conclusion that the per diem rate for meals can only be used if an employee pays for or incurs meal expenses. * * *

[*53] *      *      *      *      *      *      *

The materials cited by Mr. Kapp do not justify his conclusion. As explained above, <u>Johnson</u> (and for that matter <u>Westling</u>), at best, support an incidental expense deduction, but add little in the context of meal deduction. Not only do they <u>not</u> provide support for his position, they seemingly contradict it. Moreover, any arguments raised in the Trial Briefs submitted by Mr. Kapp in those cases, but not adopted or addressed by the Court in its opinion, are merely positions of the taxpayer and nothing more.

*      *      *      *      *      *      *

The above analysis does not foreclose the possibility that Mr. Kapp could ultimately be successful on the issue before a judge. I have not seen any Court opinions squarely addressing the exact issue presented here, and it may be one of first impression. Also, additional factual development should take place before a more definitive position can be taken. However, it appears to me that the weight of authority favors the government on the issue.

Petitioner read the draft interoffice memorandum on or shortly after April 18, 2005. Petitioner did not receive a written legal opinion from another private attorney about his position on meal expense deductions for mariners.

D.     <u>Petitioner's Website Posting During the Investigation</u>

In late December 2005 or early January 2006 petitioner posted on his websites a document titled "A Few Words of Guidance about this Website from My Office and the IRS".[23] Petitioner asserts that "[i]t has been recently brought to

---

[23]In this document petitioner asserts: "The U.S. Patent Office has just

(continued...)

[*54] the attention of my Tax Office and to some IRS Personnel that a small minority of viewers to this website are either misunderstanding or intentionally miscalculating the allowable travel deductions available to qualifying taxpayers." Petitioner then discusses a number of what he describes as "Common Misstatements and Misunderstanding Regarding My Clients' Johnson & Westling Tax Court Decisions" (misunderstandings) and then for each provides what he asserts is the correct answer, titled the "Better Approach". One of the misunderstandings that petitioner lists is that "[t]he Tax Court prohibited Johnson & Westling from claiming a meal deduction, and thus, no mariners are to be allowed a meal deduction." In the corresponding "Better Approach" petitioner asserts that "My tax office unilaterally and specifically limited my clients' tax trial to just demanding incidental expenses because each of the now 18 IRS Travel Revenue Procedures already allows meals. The Tax Court in Johnson again agreed with my office that meals could also be claimed by all qualified mariners." This statement in "Better Approach" was clearly contrary to advice that the petitioner received from his counsel regarding legal support for his positions.

---

[23](...continued)
officially awarded our tax office [12-20-05] with a U.S. Patent".

[*55] X.     Civil Case and the Permanent Injunction

A.     Civil Complaint

In early 2006 the DOJ sent petitioner a letter informing him that it was considering filing a lawsuit and providing him an opportunity to call and discuss the case.[24]  The DOJ attached to this letter a copy of the complaint it planned to file.  Petitioner received and read the letter, but he did not contact the Government in response to it.

On April 7, 2006, the DOJ filed a complaint on behalf of the United States against petitioner in the U.S. District Court for the Central District of California, Western Division, commencing No. CV 0602136 GPS (PJWx) (civil case).  The United States filed suit under sections 7407[25] and 7408 (actions to enjoin specified conduct related to tax shelters and reportable transactions) "to restrain and enjoin Kapp from preparing federal income tax returns based on the mariner tax

---

[24]Respondent asserts in his opening brief that the letter was dated February 7, 2006.  A copy of this letter was not made a part of the record.

[25]Under sec. 7407, a District Court may enjoin a tax return preparer who has engaged in several types of conduct, including conduct subject to penalty under sec. 6694 or "any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws".  Sec. 7407(a) and (b)(1)(A), (D).

**[*56]** deduction described below, or on other unrealistic positions."  The United States described the "mariner's tax deduction" as follows:

> 18. Even though the mariners were not charged for, and did not pay for, the meals provided by their employers, Kapp prepared and filed returns that claimed a "mariner's tax deduction" or business expense deduction, calculated with reference to the number of days the mariner was on board a vessel and a per diem allowance.
>
> 19. On information and belief, the mariners told Kapp (or provided documentation to him advising) how many days they were on a boat, and Kapp then multiplied that number by the per diem. Kapp then subtracted a $10 a day fee for the amount of "groceries" purportedly provided by the employer.  The result was entered on Schedule A attached to the mariners' Form 1040 and claimed as an unreimbursed employee business expense for federal tax purposes.

The complaint states, among other things, that in August 2004, February 2005, and May 2005, "federal courts in Louisiana and Alabama permanently enjoined several return preparers who had prepared federal income tax returns based on the mariner tax deduction" and that DOJ had issued a prior press release on August 24, 2004, about these cases, stating that "in the typical case, the preparers prepared returns claiming business expense deductions for meals or other incidentals that were provided to the mariners without charge by their employers."

**[*57]** B.     Petitioner's Actions After the Complaint Was Filed

In April or May 2006, shortly after the complaint was filed, petitioner sent an email titled "The **left** hand of the government does not seem to know what the **right** hand is doing" to approximately 15 of his clients.  He asserted that the DOJ and the IRS were ignoring the authorities that allow mariners to deduct meal expenses while working aboard their ships and had not interviewed or questioned him about his positions.  Notably, he wrote:  "**These government attorneys did not realize the IRS published position for the last 17 years (1990 thru 2006) is to allow mariners to claim meals.**  Surprised?  So were these government attorneys when they finally let me direct them to look at the IRS Website."  Petitioner referred to the revenue procedures and the Federal travel regulations he had been citing for his legal authorities in support of this assertion.

C.     Depositions

Petitioner was deposed for the civil case during three separate sessions on September 25, December 12, and December 13, 2006, respectively.

During the deposition counsel for the United States questioned petitioner about, among other things, his interpretation of the relevant revenue procedures, and he testified that the requirement that a taxpayer pay or incur an expense to claim a deduction is "waived by these revenue procedures."  See infra

[*58] Appendix B.  He also testified that (1) he was aware that it was industry practice for the employers of his deep sea mariner clients and employers for some of his other mariner clients, including tugboat mariners, to provide them with all daily meals, including breakfast, lunch, and dinner, while working aboard the vessels; and (2) he continued to prepare income tax returns for mariner taxpayers claiming deductions for meal expenses after the complaint was filed and as of the deposition date.

During the deposition petitioner also testified that his email to clients sent in April or May 2006 included some misstatement of facts and misrepresentations; for example, he did speak to IRS representatives who asked him questions about the so-called mariner tax deduction (i.e., EO Sims and RA Campos, who interviewed him) and he did not direct Government attorneys to look at the IRS website to prove his position on that deduction.

Petitioner subsequently testified that he generally did not require his mariner clients to provide documents showing whether meals were provided by their employers, nor did he question them about whether meals were provided.  He further testified that from March to August 2005 he did not prepare any income tax returns for clients.  Following a meeting with RA Campos in August 2005, wherein he explained his position, he indicated that on the basis of that interaction

**[\*59]** he "was left with the distinct understanding from * * * [RA Campos] that at that point, the Government understood what I was doing and was comfortable."

### D. Permanent Injunction

Cross-motions for summary judgment were filed relating to whether petitioner "should be permanently enjoined from preparing returns that claim deductions for mariners who receive free meals from their employers (the 'mariner's tax deduction' or 'MTD')." In his declaration submitted in opposition to the Government's motion for summary judgment, petitioner asserted that he had stopped the practice of claiming the mariner tax deduction, as promised in his letter dated May 24, 2005, but that he had recently resumed claiming it on behalf of his mariner clients on the basis of the alleged approval of RA Campos. Mr. Kapp wrote:

> I had a long meeting with IRS Agent George Campos on August 12,
> 2005, during which I reviewed my legal position with him in detail
> * * * At the end of the meeting, Mr. Campos sort of threw his arm
> around me and stated "Now I understand." Since Mr. Campos at no
> time during or after the * * * meeting stated that he disagreed with
> my position, or that my position was frivolous, I interpreted Mr.
> Campos'[s] statement as an endorsement of my legal position * * *

United States v. Kapp, 564 F.3d 1103, 1111 (9th Cir. 2009). On July 2, 2007, the District Court heard argument on the parties' cross-motions for summary judgment.

**[*60]** By order dated August 20, 2007, the District Court denied petitioner's

motion and granted the Government's motion. The District Court analyzed

petitioner's position under sections 162 and 274(d), the <u>Johnson</u> and <u>Westling</u>

cases, and the various other authorities petitioner cited, concluding that "[c]ontrary

to Defendant's [petitioner's] allegations, the MTD is not allowable under the Tax

Code". The District Court also concluded that petitioner's actions violated section

6694.

>        As shown above, the MTDs were illegal and Defendant
> therefore violated § 6694. However, the Treasury regulations provide
> a safe harbor where the preparer's position had a realistic possibility
> of being sustained on the merits * * *
>
> *         *         *         *         *         *         *
>
>        In light of the analysis in the previous section, there was no
> realistic possibility that the MTD deductions would be sustained.
> Defendant's position could be even considered frivolous given the
> clear illegality of the MTDs under <u>Johnson</u>. The burden therefore
> shifts to Defendant to show that he acted in good faith in promoting
> the MTDs.
>
>        As discussed in the previous section, none of the authorities
> Defendant relies upon offers credible support for his position that
> mariners are entitled to M&IE deductions for expenses they never
> incurred. Moreover, a "reasonable accountant" would have realized
> that statements made in one particular case * * * cannot simply be
> taken "at face value," as Defendant suggests, but must be interpreted
> with respect to relevant authority on the subject. Defendant's
> selective interpretation and reliance on these authorities in the face of
> IRS statements to the contrary was not in good faith.

**[\*61]** Because the District Court concluded that the Government was entitled to an injunction under section 7407, it did not opine about whether an injunction was appropriate under section 7408.

Also on August 20, 2007, the District Court filed a judgment and permanent injunction against petitioner, restraining and enjoining him from a broad range of activities relating to preparing income tax returns for mariner taxpayers, including preparing income tax returns or documents to be used "in connection with any material matter arising under the internal revenue laws" (i.e., income tax returns and other tax documents) that claim the MTD. The District Court also ordered him to (1) within 21 days, "provide a list of all persons or entities for whom he prepared returns (any portion of a return, amended returns, or refund claims), which assert or rely on the position that mariners may claim tax deductions for meals that were provided to them without cost" from January 1, 2000, through August 20, 2007, the date of the judgment; (2) post a link to the District Court's order on his websites; and (3) explain to his clients that the District Court had held that he had incorrectly advised them about the MTD.

[*62] XI.     Compliance With the Permanent Injunction and Amended Returns

A.     Client List

In late August or September 2007 petitioner called RA Campos because "he was reviewing the returns to ensure that the ones that he was going to give were the ones that * * * had the meal deductions on the returns.  So he was ensuring that he was giving * * * the right ones" on the client list that he had to provide pursuant to the permanent injunction.

On September 20, 2007, petitioner filed with the District Court and served on the DOJ a client list with a certificate of compliance signed under penalty of perjury, stating in part:

> (a) With respect to tax returns prepared for the tax years 2004-2006, I have submitted to Plaintiff a list of all persons or entities for whom I have prepared returns (or any portion of a return, amended returns or refund claims) which asserted or relied upon the position that mariners may claim tax deductions for meals that were provided to them without cost.  In preparing such list, I have made a good faith examination of my client files and tax returns * * * I believe in good faith that any inadvertent omissions * * * would constitute less than 2% of the entire list submitted.

> (b) With respect to tax returns prepared prior to 2004, it is the practice of my office to retain copies of client tax returns and records for only a three year period.  Accordingly, my office records * * * are incomplete.  I have personally conducted an extensive and good faith examination * * * and I have included on the list * * * those taxpayers who may have asserted said tax deduction on their returns for whom I was able to locate relevant records for the period 2000-

[*63] 2003.  However, there may be other taxpayers * * * for which I have no records.

The 117-page client list reflects the names, taxpayer identification numbers, addresses, and tax years of clients for whom petitioner prepared individual income tax returns for taxable years 2000 through 2006; for many of these clients, he prepared income tax returns for multiple years.  As relevant here, the client list reflects 100 clients for 2002 and 105 clients for 2003 for which Mr. Kapp "may have asserted said tax deduction on their returns".  The client list also reflects that for taxable years 2004 through 2006 Mr. Kapp prepared the following number of "returns (or any portion of a return, amended returns or refund claims) which asserted or relied upon the position that mariners may claim tax deductions for meals that were provided to them without cost":

| Year | Number of clients |
|------|-------------------|
| 2004 | 1,822 |
| 2005 | 1,785 |
| 2006 | 1,355 |

B.    Amended Income Tax Returns

After the District Court entered the judgment and permanent injunction against him, petitioner went through his client list and client files and for an estimated 2,000 mariner clients he prepared amended income tax returns on which

[*64] he removed a deduction for meals on Schedule A, line 20. He sent the amended returns to his mariner clients, informing them of the injunction and suggesting that they file the amended returns. He did not charge his clients for preparing the amended returns and let each client ultimately decide whether to file any amended return(s).

### C.    Letter to Michael Pahl

The attorney who handled petitioner's case before the District Court sent a letter dated November 7, 2007, to Michael Pahl, an attorney with the DOJ who prosecuted petitioner in the civil case. Petitioner's attorney wrote:

> This will confirm the telephone conversation we had on Friday, November 2, 2007. As I advised, Mr. Kapp is in the process of filing amended tax returns for mariners whose names appeared on the list of clients specified in the Permanent injunction. In the course of doing so, Mr. Kapp has discovered that some names were included on the client list that should not have been. For example, some of the mariners whose names appeared on the list actually incurred meal expenses while traveling away from home on their vessels * * * In addition, it appears * * * that some of the amended tax returns filed by Mr. Kapp * * * also included mariners who had actually incurred meal expenses and whose returns need not have been amended.

> During our conversation, I advised you of the foregoing, and that an amended list would in all likelihood be prepared and served on the Department of Justice and filed with the court.

There is nothing in this record indicating that petitioner provided the DOJ or the District Court with an amended client list. It also does not appear that he

**[\*65]** provided any updated information or amended filings to the DOJ or the District Court with respect to the above-mentioned amended returns.

XII.   Appeal to the Court of Appeals for the Ninth Circuit

Petitioner appealed the District Court's entry of a permanent injunction to the Court of Appeals for the Ninth Circuit.  The parties presented argument on December 10, 2008.  On May 4, 2009, the Court of Appeals filed Kapp, 564 F.3d 1103, affirming the District Court's decision in its entirety.  The Court of Appeals held, as relevant here:  (1) "Because Kapp claimed deductions on behalf of mariners who did not pay or incur meal expenses, he prepared returns that understated liability"; (2) each of petitioner's positions with respect to deep sea mariner clients and tugboat mariner clients was unreasonable; and (3) petitioner was not entitled to rely on the good-faith defense to the section 6694 penalty because he did not reasonably rely on the advice of other tax preparers.  Id. at 1110; see infra Appendix C.

With respect to the good-faith defense to the section 6694 penalty, petitioner asserted that he sought advice from a number of individuals when writing his articles, including a General Services Administration employee and private attorneys, but the Court of Appeals concluded that he did not prove that (1) they qualified as tax preparers and (2) they were "aware of all of the relevant

[*66] facts underlying the returns he filed claiming the mariner's deduction."

Kapp, 564 F.3d at 1113. Further, the Court of Appeals affirmed that "the IRS

attorneys contacted by Kapp informed him that they could not officially comment

on his articles, and that there was no procedure to set up a meeting to provide

advice specific to his situation." Id. Notably, the court concluded that petitioner's

"counsel during the investigation, the only attorneys who appear to have analyzed

his position in light of all the relevant facts, concluded that he was not entitled to

claim the deduction." Id.; see also infra Appendix C.

XIII.  The Balla and Zbylut Cases Before the Tax Court

After the permanent injunction, the Court issued two opinions involving

petitioner's mariner clients and specifically addressing his position regarding

tugboat mariners, Balla v. Commissioner, T.C. Memo. 2008-18, 2008 WL 343334,

and Zbylut v. Commissioner, T.C. Memo. 2008-44, 2008 WL 539018.

A.  Balla v. Commissioner

Jozsef Balla, a merchant mariner, was employed by Hornbeck Offshore

Operators (Hornbeck) and worked on a tugboat during taxable years 2002 and

2003. Hornbeck provided Mr. Balla with meals and lodging without charge while

he was assigned to a vessel and on active status. Hornbeck did not provide Mr.

[*67] Balla with a per diem cash allowance for work-related meals or incidental expenses.

Petitioner prepared Mr. and Mrs. Balla's Forms 1040, U.S. Individual Income Tax Return, for taxable years 2002 and 2003 electing the filing status of "married filing joint return". As relevant here, for each year Mr. and Mrs. Balla claimed a deduction for meals and incidental expenses on Schedule A, line 20, computed using the M&IE rate set forth in the revenue procedures. The "Supplemental Tug/Barge Sailor Travel Schedule" computed the deduction for 2002 as follows:

| Number of travel days | Port of destination | OCONUS M&IE rate by city | Total |
|---|---|---|---|
| 80 | Guayama <San Juan>, Puerto Rico | $75 | $6,000 |
| 39 | Arecibo <San Juan>, Puerto Rico | 75 | 2,925 |
| 44 | Guayaquil, Ecuador | 57 | 2,508 |
| 25 | St. Croix, Virgin Islands | 76 | 1,900 |
| 33 | Mayaguez <Other>, Puerto Rico | 57 | 1,881 |
| 18 | San Juan, Puerto Rico | 75 | 1,350 |
| 4 | Aguirre <San Juan>, Puerto Rico | 75 | 300 |
| 5 | Yabaccoa <Other>, Puerto Rico | 57 | 285 |
| Total Sailor Travel Costs Allowed per OCONUS Rates | | | 17,149 |
| **LESS EMPLOYER PROVIDED REIMBURSEMENTS** | | | (2,852) |
| Sailor Travel Allowance in Excess of Reimbursements | | | 14,297 |

**[\*68]** Using the same methodology, the Ballas claimed a deduction for meals and incidental expenses or "Sailor Travel Allowance in Excess of Reimbursements" of $14,776 on their 2003 Schedule A, line 20. Petitioner attached to each of the Ballas' 2002 and 2003 Forms 1040 the following documentation purporting to support the deduction: (1) authorities on which they relied in support of their tax position; (2) a port list for the vessel on which Mr. Balla was stationed during the year; and (3) a schedule listing ports to which Mr. Balla traveled during the year. He did not provide receipts, other documentation, or explanations to substantiate the amounts or business purpose of the expenses claimed.

The IRS issued notices of deficiency to the Ballas for taxable years 2002 and 2003 disallowing a number of deductions, including the deductions for meals and incidental expenses for each year. The Ballas timely petitioned the Tax Court. Petitioner's office assisted the Ballas with the filing of their petition.

On January 31, 2008, the Court filed its opinion at T.C. Memo. 2008-18 upholding, as relevant here, the IRS' determination disallowing the Ballas' claimed MTD for 2002 and 2003. Relying on the Johnson Opinion, the Court held that (1) under sections 162 and 274 and the section 274 regulations, a taxpayer is not entitled to deemed substantiated deductions for meals if he did not incur or pay any meal expenses and (2) the Federal travel regulations require that the M&IE

[*69] rate be adjusted for meals provided to Government employees by the Government (but not less than the amount allowed for incidental expenses) and that since the revenue procedures apply the M&IE rate for non-Government employees, under the regulation a taxpayer must decrease the M&IE rate to account for meals provided by the taxpayer's employer. Balla v. Commissioner, 2008 WL 343334, at *5-*6. The Court also stated that the Ballas "argue that this issue is novel to the Court. We disagree. * * * [W]e explicitly stated in Johnson v. Commissioner, supra at 227: 'We do not read the revenue procedures to allow a taxpayer to use the full M&IE rates when he or she incurs only incidental expenses.'" Id. at *6.

B.    Zbylut v. Commissioner

Raymond Zbylut, a merchant mariner, was employed as a temporary employee by American Ship Management, LLC (American Ship), and Matson to work on tugboats during 2002. American Ship and Matson each provided meals without charge to Mr. Zbylut while he was assigned to a vessel and on active status. Neither American Ship nor Matson provided Mr. Zbylut with a per diem cash allowance for work-related meals or incidental expenses.

Petitioner prepared Mr. and Mrs. Zbylut's 2002 Form 1040 electing the filing status of "married filing joint return" and claiming on Schedule A, line 20, a

[*70] deduction for meals and incidentals expenses of $9,455, computed using the

M&IE rates for Mr. Zbylut's various ports of destination for 2002 multiplied by

the number of days traveling. Petitioner attached (1) tax authorities on which his

clients relied in support of their tax position; (2) a port list for the vessels on

which Mr. Zbylut was stationed during the year; and (3) a schedule listing ports to

which Mr. Zbylut traveled during the year. Neither petitioner nor the taxpayers

provided receipts, other documentation, or explanations to substantiate the

amounts or business purpose of the expenses claimed.

The IRS issued to the Zbyluts a notice of deficiency for taxable year 2002

disallowing a number of deductions, including the above-mentioned $9,455

deduction. The Zbyluts timely petitioned the Tax Court. Petitioner's office

assisted the Zbyluts with the filing of their petition.

On February 27, 2008, the Court filed the opinion at T.C. Memo. 2008-44

upholding, as relevant here, the IRS' determination disallowing the MTD. Similar

to the holding in Balla v. Commissioner, T.C. Memo. 2008-18, the Court applied

Johnson v. Commissioner, 115 T.C. at 227-228, and reached the holding that

(1) under sections 162 and 274 and the relevant section 274 regulations, a taxpayer

is not entitled to deemed substantiated deductions for meals if he did not incur or

pay any meal expenses and (2) the Federal travel regulations require that an M&IE

[*71] rate be adjusted for meals provided to Government employees by the Government (but not less than the amount allowed for incidental expenses) and that since the revenue procedures apply the M&IE rate for non-Government employees, under the regulation a taxpayer must decrease the M&IE rate to account for meals provided by the taxpayer's employer. Zbylut v. Commissioner, 2008 WL 539018, at *3-*5.

XIV. Penalty Assessment

RA Campos used the client list petitioner provided in September 2007 to compute the section 6701 penalty, imposing a $1,000 penalty for each income tax return which petitioner stated he had prepared for taxable years 2000 through 2006, a total of 5,193 returns.

Additionally, RA Campos compiled an internal list from the IRS database of approximately 5,000 taxpayers whose returns petitioner prepared for taxable years 2000 through 2006 and which claimed a Schedule A unreimbursed employee expense deduction. RA Campos compared this list with petitioner's client list and found that petitioner's client list had more income tax returns because it included approximately 35 to 50 returns for which petitioner had prepared only the travel schedule for the client. A copy of this internal list was not made a part of the record.

**[\*72]** In May 2008 RA Campos made the initial determination to assert section 6701 penalties totaling $5,193,000 for taxable years 2000 through 2006 against petitioner. This number included $5,167,000 in penalties for the years in issue on the basis of the 5,167 tax returns identified for taxable years 2002 through 2006. RA Campos generated a civil penalty approval form and had the penalties approved and the form signed by his immediate supervisor on June 16, 2008. The IRS assessed the section 6701 penalties on July 14, 2008.

XV.    Income Tax Returns in the Record

The client list identifies 5,167 separate returns for tax years 2002 through 2006, inclusive, for which petitioner applied the MTD.[26] Because of the Government's return retention policy, respondent was not able to find all of the returns on the client list for the tax years in issue. Respondent was able to find 4,377 income tax returns and amended income tax returns[27] (for which petitioner prepared either the entire return or solely the travel schedule) for taxable years 2002 through 2006 using the client list. The parties stipulated an exhibit which

---

[26]The client list identifies an additional 26 tax returns for taxable years 2000 and 2001, years which are not in issue.

[27]The amended tax returns are relevant here in that they include an attached copy of the original Schedule A showing the MTD originally claimed for each client.

[*73] consists of electronic copies of these 4,377 tax documents plus an additional three tax documents for taxable year 2001, a year which is not in issue. See supra note 5. For some of these returns, the travel schedule is not attached to the copy included in the record, but a travel schedule was attached to the original return when it was filed.

Of the 4,377 returns in the record related to the years in issue, respondent has conceded that 930 returns included both a Form 1040 and a Form 1040X, Amended U.S. Individual Income Tax Return, for the same taxpayer for the same tax year.[28] This leaves 3,447 individual tax returns in the record for the years in issue that consist of either a Form 1040 or a Form 1040X for the same taxpayer for an individual year that claim the MTD. The parties stipulated these 3,447 tax returns in the record as follows:

| Tax year | Original returns | Amended returns | Travel schedules | Total |
|---|---|---|---|---|
| 2002 | 5 | -0- | -0- | 5 |
| 2003 | 6 | -0- | -0- | 6 |
| 2004 | 452 | 194 | 39 | 685 |
| 2005 | 1,405 | 27 | 151 | 1,583 |

---

[28]The record includes three tax returns relating to tax year 2001, which is not in issue in this case. It is unclear whether the three tax returns would have an understatement if the MTD is removed.

| [*74] | 2006 | 1,020 | 29 | 119 | 1,168 |
|-------|------|-------|-----|-----|-------|
|       | Total | 2,888 | 250 | 309 | 3,447 |

Of the 3,447 returns or schedules identified above, respondent has conceded that only 3,221 tax documents reflect an understatement if the MTD is removed. The remaining 229 returns do not have an understatement because of either the operation of the AMT or the taxpayer's claiming the standard deduction instead of the itemized deduction when filing his or her return.

XVI. CDP Hearing and Petition

The IRS issued a Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice), dated August 28, 2008, and two lien notices, dated August 14, 2008, to collect the section 6701 penalties. On September 11, 2008, petitioner submitted a written request for a CDP hearing in response to the lien notices, asserting that he is not liable for the section 6701 penalties assessed. Petitioner also timely submitted a written request for a CDP hearing in response to the levy notice in which he asserted that he is not liable for the section 6701 penalties assessed.

By letter dated April 26, 2011, Settlement Officer (SO) Alicia Flores notified petitioner and his representative Robert B. Martin that a CDP hearing was scheduled for May 26, 2011, and explained that petitioner would have to submit

**[\*75]** financial information with supporting documentation and bank records if he wanted to be considered for collection alternatives. On May 26, 2011, Attorney Martin participated in the CDP hearing via telephone for all three notices with SO Flores. During the hearing Attorney Martin informed SO Flores that petitioner was not interested in seeking collection alternatives and that he would wait for the notices of determination and challenge the penalties before the Tax Court. Petitioner did not submit the financial information and documentation requested in SO Flores's letter before, during, or after the hearing. As indicated <u>supra</u> note 4, notices of determination were issued on July 14, 2011.

In his timely filed petitions, petitioner asserts only that "[t]he Commissioner erred in his determination that petitioner is subject to penalties under Code section 6701 in the aggregate amount of $5,193,000".

OPINION

I.    <u>Procedural Matters</u>

Before we address the substantive issues presented in these cases, we first address some procedural matters.

**[\*76]** A.     Evidentiary Objections

1.     Admissibility of Civil Penalty Approval Form[29]

At trial petitioner objected to the admission into the record of a copy of the Civil Penalty Approval Form, Workpaper #:  300-1 (penalty approval form), and accompanying Form 2866, Certificate of Official Record, dated June 21, 2017, related to the penalties at issue.

Petitioner objects to the admission of the penalty approval form on four grounds:  (1) that the penalty approval form constitutes hearsay, (2) that production of the penalty approval form was untimely as it was not produced as part of a Freedom of Information Act (FOIA) request from August 2008, (3) that production of the penalty approval form was untimely because it was not produced at least 14 days before trial in accordance with this Court's standing pretrial order, and (4) that the authenticity of the form is questionable because the "initials on the proffered [p]enalty [a]pproval [f]orm * * * do not match the initial signature of the 'reviewer' on the forms that were in the administrative file" as stipulated.  We will address each objection herein.

---

[29]We limit our discussion here as to the question of admissibility and discuss infra pp. 93-95 the questions of appropriate supervisory approval and verification.

**[\*77]** Petitioner's principal argument is that the penalty approval form is offered as proof of managerial approval under section 6751(b)(1) and is therefore inadmissable as hearsay. Petitioner further contends that the hearsay exception in rule 803(8) of the Federal Rules of Evidence for a record of public office does not apply. Respondent contends that the penalty approval form is not hearsay because it falls under an exception in rule 803(6) of the Federal Rules of Evidence. We agree with respondent.

Pursuant to rule 803(6) of the Federal Rules of Evidence, records of regularly conducted activity are not excluded as hearsay if the following conditions are satisfied:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

> (C) making the record was a regular practice of that activity;

> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

**[*78]** Rule 902(11) of the Federal Rules of Evidence provides that certified domestic records of regularly conducted activity are self-authenticating if they meet the requirements of rule 803(6)(A)-(C) as shown "by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court." The Court has examined the penalty approval form and finds it is a record kept in the ordinary course of a business activity as shown by the Form 2866. See Fed. R. Evid. 803(6), 902(11).

Petitioner next argues that the penalty approval form should not be admitted into the record because it was not included in an earlier FOIA request made to the IRS. On August 14, 2008, petitioner submitted an FOIA request to the IRS for "copies of the administrative files pertaining to the penalty charged against the preparer under section 6701, for the years 2000 through 2005". Respondent objects to petitioner's argument on the ground that it is misleading. Respondent argues that petitioner's FOIA request was for documents related only to tax years 2000 through 2005. The penalty approval form also covers tax year 2006, which is outside the scope of the FOIA request. Respondent contends that the document would not have been included in the response to the FOIA request for this reason.

We have held that FOIA establishes an orderly procedure for enforcement of the act through the commencement of an action in the U.S. District Courts, see

**[\*79]** 5 U.S.C. sec. 552(a)(4)(B) (2012), and therefore FOIA matters do not affect issues before this Court, <u>Davis v. Commissioner</u>, 65 T.C. 1014, 1024 (1976); <u>Bennett v. Commissioner</u>, T.C. Memo. 1997-505, 1997 WL 695368, at \*2; <u>Maple v. Commissioner</u>, T.C. Memo. 1990-567. Therefore, this Court will not undertake to implement the provisions of FOIA and will not consider FOIA requests in deciding the admissibility of evidence.

Petitioner further objects to admission of the penalty approval form because it was provided to petitioners via email on June 15, 2017, 11 days before the trial held on June 26, 2017. Thus, it was not exchanged at least 14 days before trial as required by the Court's standing pretrial order (14-day rule). Respondent asserts that the penalty approval form was properly authenticated and exchanged with petitioner immediately following a conference call on June 15, 2017. Respondent contends, and petitioner has not denied, that petitioner raised the supervisory approval requirement of section 6751(b) for the first time on that conference call. For this reason, respondent asserts that petitioner was not prejudiced by receipt of the penalty approval form fewer than 14 days before trial.

The Court's standing pretrial order provides that one possible sanction for violating the 14-day rule is the exclusion of evidence that was not exchanged in accordance with that requirement. <u>See</u> Rule 131(b) ("Unexcused failure to comply

**[\*80]** with any \* \* \* [standing pretrial] order may subject a party or a party's counsel to sanctions.). The 14-day rule is intended to allow the opposing party opportunity to review evidence to prepare any challenge or rebuttal. <u>Kornhauser v. Commissioner</u>, T.C. Memo. 2013-230, at \*9 n.4 (citing <u>Dunn v. Commissioner</u>, T.C. Memo. 1988-45), <u>aff'd</u>, 632 F. App'x 421 (9th Cir. 2016).

In weighing the appropriate sanction for violation of the 14-day rule, the Court considers whether the opposing party was prejudiced by the failure. <u>See</u> <u>Thompson v. Commissioner</u>, T.C. Memo. 2011-291, 2011 WL 6382704, at \*2 n.8; <u>Morris v. Commissioner</u>, T.C. Memo. 2008-65, 2008 WL 704208, at \*1, <u>aff'd</u>, 431 F. App'x 535 (9th Cir. 2011). In <u>Morris v. Commissioner</u>, 2008 WL 704208, at \*1, for example, we concluded that the Commissioner was prejudiced because the taxpayer's records were discovered at trial to be full of errors and the Commissioner had insufficient time to review the proffered documents. We also consider why a party failed to comply with the standing pretrial order, and absent good cause, we do not hesitate to enforce the 14-day rule. <u>See Rodriguez v. Commissioner</u>, T.C. Memo. 2017-173, at \*6 (citing <u>Kaplan v. Commissioner</u>, T.C. Memo. 2016-149, at \*9-\*10).

[*81] Respondent claims that petitioner has not been prejudiced by his providing the penalty approval form 11 days before trial rather than the full 14 days as ordered. We agree.

This Court issued its Opinion in Graev v. Commissioner (Graev III), 149 T.C. 485 (2017), supplementing and overruling in part 147 T.C. 460 (2016), on December 20, 2017. The Court recognizes that there have been a number of developing legal issues in flux since that Opinion was issued. Following the issuance of Grave III, this Court has allowed the record to be reopened posttrial in a number of cases for the purpose of admitting evidence of appropriate supervisory approval where it was available. See, e.g., Dorval v. Commissioner, T.C. Memo. 2018-167, at *16-*17 (allowing the admission because the evidence was not cumulative, was material to the penalty issue in the case, and probably would change the outcome); Householder v. Commissioner, T.C. Memo. 2018-136, at *26-*27. Such holdings by the Court were in the interest of justice both because the respective record in each case was closed before the issuance of Graev III and because the taxpayers in each case did not raise section 6751(b) as an issue before trial. Dorval v. Commissioner, at *17; Householder v. Commissioner, at *26-*27.

**[*82]** Although the <u>Graev III</u> Opinion had been issued before the commencement of trial in these cases, petitioner similarly did not raise section 6751(b) as an issue until the conference call 11 days before trial, at which time the evidence of approval was promptly produced. We conclude that petitioner was not prejudiced by respondent's production of the document 11 days before trial.

Finally, petitioner asserts that the initials on the penalty approval form do not match Ms. Huberman's signature on other documents in the record, presumably as a means of questioning the authenticity of the document. We disagree. At trial RA Campos testified that the original penalty approval form was initialed by his supervisor and that the initials found on the copy of the document were authentic. RA Campos' basis for identifying Ms. Huberman's signature was his personal experience of seeing her sign documents many times. We find his testimony persuasive. In contrast, petitioner has offered no substantive evidence that the disputed document or RA Campos' testimony is somehow unreliable.

For the aforementioned reasons, we will admit the penalty approval form into evidence under rule 902(11) of the Federal Rules of Evidence.

[*83]    2.    Respondent's Relevancy Objections

The stipulation of facts includes three exhibits proffered by petitioner. Respondent objected to these exhibits on the grounds that they are not relevant.

The first exhibit is a copy of the trial transcript in the consolidated trial of Johnson and Westling dated Tuesday, May 2, 2000 (trial transcript). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Fed. R. Evid. 401. Relevant evidence is generally admissible unless specifically barred by the U.S. Constitution, a Federal statute, another Federal Rule of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. The trial transcript for the Johnson and Westling cases is relevant because it provides additional background on the respective taxpayers, petitioner's preparation of their tax returns, and their cases before this Court. Each of these points is relevant to petitioner's knowledge of the law surrounding the MTD. Therefore, we overrule respondent's relevance objection and receive the trial transcript into evidence.

The remaining exhibits are letters that relate to a petitioner's FOIA request covering materials the IRS used to train its employees in understanding and implementing Federal travel regulations for travel-related expenses. The second

[*84] exhibit is a copy of an unsigned letter dated January 24, 2011, from the law firm which handled petitioner's FOIA request (petitioner's FOIA attorney) to the "Internal Revenue Service Disclosure Scanning Operation". The third exhibit is a letter dated February 17, 2011, from Disclosure Specialist Christi Hardee to petitioner's FOIA attorney. We sustain respondent's relevance objections with respect to each exhibit for the same reason that we concluded FOIA requests were not of consequence to our conclusion as to the admissibility of the penalty approval form. See supra pp. 78-79.

### 3. Petitioner's Relevancy Objection

As a part of the stipulations in these cases respondent submitted a letter from petitioner's LA attorney to RA Campos dated May 24, 2005. Petitioner objects to this exhibit as irrelevant and/or immaterial. The contents of the letter relate to opinions and advice given to petitioner by his counsel and petitioner's understanding of the law and the IRS' position on the law surrounding meal deductions for tugboat mariners as of May 2005. The opinions, advice, and discussions with the IRS on these matters in 2005 are relevant and material to petitioner's motives and knowledge of the tax law. This is clearly a fact that is of consequence to the determination of the action within the meaning of rule 401 of the Federal Rules of Evidence. Under these circumstances we conclude that the

**[*85]** exhibit is relevant. We overrule petitioner's relevance objection and receive the exhibit into evidence.

B.  Petitioner's Motions To Strike

On October 26, 2017, respondent filed his simultaneous opening brief (respondent's opening brief). As an attachment to respondent's opening brief, respondent included two appendixes. Appendix 1 is described within the brief as "an Excel spreadsheet using the records in evidence identifying the 1,088 amended returns prepared by petitioner, resulting in an understatement". Appendix 2 is described within the brief as "an Excel spreadsheet using the records in evidence to identify 2,133 returns that result in an understatement after the MTD is removed."

On January 5 and February 20, 2018, petitioner filed posttrial motions (collectively, petitioner's motions to strike) under Rules 52 and 143(c) requesting that the Court strike both appendixes from respondent's opening brief on the grounds that they constitute new evidence that was not previously made a part of the record. On January 23 and March 16, 2018, respondent filed objections to petitioner's motions to strike.

Petitioner asserts that neither the 24-page Appendix 1 nor the 66-page Appendix 2 was the subject of a stipulation, offered as evidence at trial, or

**[\*86]** otherwise a part of the record in these cases. Petitioner further asserts that both appendixes represent new evidence which respondent attached to his brief. Respondent objects to petitioner's motions to strike on the basis that all of the documents (namely the tax returns, amended tax returns, and tax schedules that petitioner prepared for his mariner clients) relied upon to create Appendixes 1 and 2 are in the record and the appendixes "serve only to illustrate respondent's arguments, setting out in summary format evidence that is already in the case record." In sum, respondent asserts that the appendixes should not be considered new evidence but rather guides to assist the Court in reviewing the voluminous case evidence.

Summaries, calculations, and other statements in a party's brief or documents attached to a party's brief do not constitute admissible evidence, and this Court will not consider them. See Rule 143(c); Evans v. Commissioner, 48 T.C. 704, 709 (1967), aff'd per curiam, 413 F.2d 1047 (9th Cir. 1969); Perkins v. Commissioner, 40 T.C. 330, 340, 1963 WL 1368 (1963); Mears v. Commissioner, T.C. Memo. 2013-52; Sandberg v.Commissioner, T.C. Memo. 2011-72.

Rule 1006 of the Federal Rules of Evidence provides that a proponent may use a summary, chart, or calculation to prove the content of voluminous writings that cannot be conveniently examined in court. Normally the proponent of a

**[*87]** summary will present a proper foundation as to the correctness of such a summary exhibit. For example, a Government agent can present summary testimony and documents, typically at the end of a trial, to support computations in a bank deposits analysis. See, e.g., United States v. Soulard, 730 F.2d 1292, 1300 (9th Cir. 1984) (holding that summary charts are not to be admitted in evidence or used by the jury during deliberations but can be used as "testimonial aids" during the agent's testimony and during closing arguments). Rule 1006 of the Federal Rules of Evidence presumes that the summary document will not be offered as independent evidence by the proponent and that opposing counsel will have an opportunity to cross-examine the proponent as to the accuracy of the underlying evidence in the record and any analysis supporting the evidence. See United States v. King, 616 F.2d 1034, 1041 (8th Cir. 1980) ("Where charts which fairly summarize the evidence are used as an aid in understanding the testimony already introduced and the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary, the use of charts is proper." (citing Gordon v. United States, 438 F.2d 858, 877 (5th Cir. 1971))). We address each of respondent's appendixes to decide whether to grant petitioner's motions to strike.

**[\*88]**     1.     Appendix 1

Appendix 1 consists of five columns which give the following information in relation to each of the 1,088 amended returns in the evidence:  name of taxpayer, tax year, tax form, the first Bates page number of Exhibit 83-J where the return appears, and an alleged understatement of tax.

Petitioner contends that respondent provided no explanation regarding how he arrived at the amount of each understatement.  Respondent contends that all information in Appendix 1 is "gleaned from the individual amended tax returns contained in Exhibit 83-J" and thus is just a summary of what the returns reflect.

2.     Appendix 2

Appendix 2 consists of 12 columns giving the following taxpayer information for each of the 2,133 original tax returns in evidence:

A.     Taxpayer name;

B.     Beginning Bates page number (for Exhibit 83-J showing the first page of the return in question);

C.     MTD claimed on travel statement;

D.     Total travel days;

E.     Incidental rate (allowed by the applicable revenue procedure);

F.     New incidental amount after removal of MTD;

[*89] G.      Adjusted amount (MTD removed from the return);

H.      Original taxable income (as reported on return);

I.      Adjusted taxable income (as calculated by respondent after MTD removal);

J.      New tax (as calculated by respondent after MTD removal);

K.      Old tax (as reported on return); and

L.      Understatement (as calculated by respondent and based on the difference between the old tax and the new tax).

As with Appendix 1, petitioner contends that Appendix 2 is not a summary of anything in the tax returns in evidence. Respondent contends that the spreadsheet in Appendix 2 is merely a guidance document summarizing information from the tax returns in evidence.

Respondent did not present a summary witness to explain the calculations nor provide petitioner the opportunity to test the correctness of the calculations. Appendix 2 would require additional calculations and analysis. By respondent's own admission, the calculations require a series of steps to identify items on a return, separating not so clearly identified calculations of tax on the basis of identification and assumptions, applying the Code and revenue procedures with respect to some of the items, and comparing the original and amended returns.

[*90] Specifically, the information in columns F, G, I, J, and L of Appendix 2 are computations relating to 2,133 returns that respondent makes for the first time in his opening brief. Column F requires application of the incidental rate found in the applicable revenue procedure multiplied by the number of travel days reflected in each taxpayer's return. Column G requires calculation of a deduction based on the incidental rate calculated in column F. Column I shows respondent's proposed adjusted taxable income for each taxpayer, including the MTD adjustment, while column J shows the total tax computed using column I and the appropriate tax table for the tax year in issue.[30] Finally, the alleged understatements in column L are computed by subtracting the tax reported on each original return from respondent's proposed tax due (column J – column K).

The foundation for the analysis, calculations, and conclusions could have been presented through a summary witness and summary document. Petitioner would have had an opportunity to review and test the accuracy of the analysis and calculations and compare the summary document to the returns in the record. Petitioner was denied that opportunity, and the Court likewise did not have a full and fair opportunity to consider the summary presented with a proper foundation.

---

[30]The Court notes that Appendix 2 does not include a column showing the tax year for each return. These calculations would further require the appropriate tax tables for the years in issue, none of which are included in the record.

**[*91]** As indicated, rule 1006 of the Federal Rules of Evidence anticipates that the proponent of a summary document will provide a proper foundation through a qualified witness. Such a foundation might assist the Court in providing an explanation and analysis of the calculations included in the summary. Respondent failed to do this.

As respondent did not provide the numerous calculations and analysis before or at trial, petitioner did not have an opportunity to review Appendix 1 or Appendix 2 for accuracy. Because the summaries were not properly made part of the record, the Court agrees with petitioner that the information in Appendixes 1 and 2 may not be considered. Consequently, petitioner's motions to strike Appendixes 1 and 2 will be granted, and these documents are deemed stricken.

II.     Collection Review and Section 6701(a)

The primary issue for the Court to decide, in the context of this collection review proceeding, is whether petitioner is liable for a penalty for aiding and abetting an understatement of tax liability pursuant to section 6701(a). We briefly discuss the collection review proceeding and then discuss the elements of section 6701(a).

**[\*92]** A.    <u>Collection Due Process</u>

The Secretary[31] is authorized to collect tax by levy upon property and property rights of a taxpayer liable for taxes if such person fails to pay those taxes within 10 days after notice and demand for payment is made. Sec. 6331(a). A "tax" may include the liability for a section 6701 penalty. <u>See</u> sec. 6671(a); <u>see also</u> <u>Blaga v. Commissioner</u>, T.C. Memo. 2010-170, 2010 WL 3023961, at \*4. Before the Secretary may levy upon the taxpayer's property, the Secretary must first notify the taxpayer in writing of the intent to levy, sec. 6331(d)(1), and the taxpayer's right to a CDP hearing, sec. 6330(a)(1). If a taxpayer makes a timely request for a hearing, the hearing shall be held before an impartial officer or employee of the Appeals Office. Sec. 6330(b).

This Court has jurisdiction under section 6330(d) to review the Commissioner's administrative determinations. Section 6330(d)(1) does not prescribe the standard of review that this Court should apply in reviewing an IRS administrative determination in a CDP case; the general parameters for such

---

[31]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A)(i).

**[\*93]** review are set by caselaw. Where the underlying tax liability is not at issue we review the determination for abuse of discretion. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 182 (2000). Where the underlying tax liability is properly at issue, we review that issue de novo. Sego v. Commissioner, 114 T.C. at 610. When the Court conducts a de novo review of the underlying liability, we review all determinations not involving the underlying liability for abuse of discretion. Gardner v. Commissioner, 145 T.C. 161, 183 (2015), aff'd sub nom. United States v. Gardner, 704 F. App'x 720 (9th Cir. 2017); Craig v. Commissioner, 119 T.C. 252, 260 (2002). An abuse of discretion occurs if the Appeals Office exercises its discretion "arbitrarily, capriciously, or without sound basis in fact or law." Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

The parties agree that petitioner's underlying liabilities for tax years 2002 through 2006 are properly at issue. Accordingly, we review de novo petitioner's liability for the section 6701 penalties. See Goza v. Commissioner, 114 T.C. at 181; see also Williams v. Commissioner, 131 T.C. 54, 58 n.4 (2008).

During an Appeals Office CDP hearing the Appeals officer must "obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met." Sec. 6330(c)(1). Respondent issued

**[\*94]** two Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, each dated July 14, 2011. In the notices of determination, respondent confirmed that the requirements of all applicable law and administrative procedure had been met. As indicated, we review this verification requirement for abuse of discretion. See Gardner v. Commissioner, 145 T.C. at 183; Craig v. Commissioner, 119 T.C. at 260. This Court will review the Appeals officer's verification under section 6330(c)(1) without regard to whether the taxpayer raised it at the Appeals hearing. Hoyle v. Commissioner, 131 T.C. 197, 202-203 (2008), supplemented by 136 T.C. 463 (2011).

For penalties under section 6701, respondent's burden of production includes the burden of producing evidence establishing that the penalties were "personally approved (in writing) by the immediate supervisor of the individual making such determination" as required by section 6751(b). See Graev III, 149 T.C. at 492-493. The section 6701 penalties do not fit either of the statutory exceptions to this supervisory approval requirement. They are not additions to tax under section 6651, 6654, or 6655. Sec. 6751(b)(2)(A). Additionally the record is clear that the penalties were not automatically calculated through electronic

[*95] means.[32]  Sec. 6751(b)(2)(B).  This Court has held that section 6751(b) requires written approval of the initial penalty determination before the date when the taxpayer is sent written notification of the penalties proposed.  Clay v. Commissioner, 152 T.C. __ (Apr. 24, 2019); see also Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42.

Respondent has submitted for the record copies of the penalty approval form for the penalties at issue as well as forms showing the computations for miscellaneous penalties for each year at issue, each with a certificate establishing that the forms were a part of the administrative record.  Each document displays the initials RH.  RA Campos testified that the initials on the penalty approval form were those of Ruth Huberman, RA Campos' supervisor, and that the form was a part of the administrative record.[33]  Ms. Huberman signed the penalty approval form on June 16, 2008, before the IRS assessed the section 6701 penalties on

---

[32]At trial RA Campos testified that he had personally calculated the penalties.  We find his testimony on this issue persuasive.

[33]Ms. Huberman signed the form as "Group Manager".  However, Internal Revenue Manual pt. 20.1.1.2.3 (1), (12) (Feb. 22, 2008) specified that the approval must be by the "immediate supervisor", as required by sec. 6751(b).  The presumption of regularity, see Walker v. Commissioner, T.C. Memo. 2018-22, at *19 n.6, warrants the presumption that Ms. Huberman was the immediate supervisor.

**[\*96]** July 14, 2008.  See Clay v. Commissioner, 152 T.C. at __ (slip op. at 45).

RA Campos' testimony was persuasive.

In Blackburn v. Commissioner, 150 T.C. 218, 223 (2018), we held that the

existence of a penalty approval form in the record was sufficient to establish the

settlement officer's verification of assessments when the administrative record

reflects compliance with administrative procedures.  See Humiston v.

Commissioner, T.C. Memo. 2019-9, at \*7-\*8.  On the basis of the record we

conclude respondent has met his burden of production under section 6751(b)(1).

Accordingly, we are satisfied that respondent has met the verification

requirements.

B.     Section 6701 Penalty

In 1982 Congress enacted three new assessable penalties, codified in

sections 6700-6702, and rules applicable to those penalties, codified in section

6703.  See Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248,

secs. 320, 322, 324, 326, 96 Stat. at 611-613, 615-617; S. Rept. No. 97-494

(Vol. 1), at 266-267, 270-271, 275-279 (1982), 1982 U.S.C.C.A.N. 781, 1014-

1025.  Section 6701 provides for the imposition of a penalty on any person who

**[*97]** aids and abets another person in understating his or her tax liability. Section 6701(a) provides as follows:

Sec. 6701(a) Imposition of Penalty.--Any person--

(1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document,

(2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and

(3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person,

shall pay a penalty with respect to each such document in the amount determined under subsection (b).

Section 6701(b)(1) provides that the amount of the penalty imposed by section 6701(a) shall be $1,000.

### 1. Burden of Proof

The Commissioner bears the burden of proving that a taxpayer is subject to a section 6701 penalty. Sec. 6703(a). Most Courts of Appeals that have resolved the burden issue have adopted the preponderance of the evidence standard rather than the more stringent clear and convincing evidence standard for the

**[\*98]** Government's burden of proof under section 6701.[34]  See Barr v. United States, 67 F.3d 469-470 (2d Cir. 1995); Mattingly v. United States, 924 F.2d 785, 787 (8th Cir. 1991); Mitchell v. United States (In re Mitchell), 109 B.R. 434 (Bankr. W.D. Wash. 1989), amended by 109 B.R. 441 (Bankr. W.D. Wash. 1990), aff'd, 1990 WL 142016 (W.D. Wash. Aug. 31, 1990), rev'd on other grounds, 977 F.2d 1318 (9th Cir. 1992).  But see Carlson v. United States, 754 F.3d 1223, 1229 (11th Cir. 2014) (finding that section 6701 requires proof of fraud by the tax return preparer, and thus the Government was required to prove the preparer's liability by clear and convincing evidence).  Since we conclude that there is clear and convincing evidence satisfying the provisions of section 6701, we need not and do not opine as to the proper burden of proof.

---

[34]Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal." Scharringhausen v. Commissioner, T.C. Memo. 2012-350 at \*34 (quoting Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 516 (1990)); see also Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1105 (9th Cir. 1992) ("Clear and convincing evidence means evidence sufficient to support a finding of 'high probability.'" (quoting Mock v. Mich. Millers Mut. Ins. Co., 5 Cal. Rptr. 2d 594, 610 (Ct. App. 1992))).

**[*99]** 2. Aiding, Assisting, or Preparing With Knowledge of Use of Document

The first element of section 6701(a) requires that the person to be penalized must aid, assist in, procure, or advise with respect to "the preparation or presentation of any portion of a return, affidavit, claim, or other [tax] document". The second element requires that the person know or have reason to believe that such portion of a document will be used in connection with a material matter arising under the internal revenue laws.

The Court considers these two requirements. Petitioner is a licensed C.P.A. who prepared and/or assisted in the preparation of tax returns for mariner clients. The record reflects that petitioner repeatedly gave advice to his clients regarding deductions for meals which were provided without cost to them. Petitioner prepared tax returns and/or schedules claiming such deductions for hundreds of taxpayers during the years in issue. Petitioner was very public in the advertisement and promotion of his tax preparation services. He expressed the clear view that mariners could properly claim deductions for meals irrespective of whether they expended any of their own funds for the meals. Petitioner prepared the tax returns or portions of tax returns (the mariner schedules) fully knowing and for the express purpose of their submission to the IRS. There is no serious doubt

**[*100]** that the submissions were intended to be used in connection with a material matter arising under the internal revenue laws.  The Court concludes that the first two elements of section 6701(a) have been satisfied.

We now consider the third element of section 6701(a):  that the person described in subsections (a) and (b) know that the "portion of a return" (if used) would result in an understatement of tax.  This subsection has two integral parts: (1) the knowledge requirement and (2) the understatement requirement.

3.    Knowledge

The clear direction in section 6701(a)(3) requires a finding that the person preparing or presenting the portion of the return have knowledge that the document (if used) would result in an understatement of tax.  Congress has clearly distinguished the scienter requirement of section 6701 from that in other statutes, e.g., section 6694(b) and section 7206(2).  The discussion in Sansom v. United States, 703 F. Supp. 1505, 1509-1510 (N.D. Fla. 1988), is instructive in this regard:

> In enacting Section 6701 Congress sought to fill a gap in the civil penalty provisions in the Internal Revenue Code. * * *
>
> *       *       *       *       *       *       *
>
> Despite the obvious relation of section 6701 to other penalties in the Internal Revenue Code, Congress distinguished Section 6701

**[\*101]** by proscribing "<u>knowing</u>" conduct, rather than "willful" conduct, as in the other penalty provisions.  For example, the criminal penalty requires that the tax preparer "wilfully" prepare a fraudulent return or tax-related document.  26 U.S.C. § 7206(2).  Under that standard, the government must show a "voluntary, intentional violation of a known legal duty."  <u>United States v. Bishop</u>, 412 U.S. 346, 360 \* \* \* (1973); <u>see</u> <u>United States v. Damon</u>, 676 F.2d 1060, 1063 (5th Cir. 1982).

Section 6694 authorizes imposition of civil penalties on income tax preparers.  Section 6694(a) imposes a $100 penalty for negligent or intentional disregard of revenue rules and regulations.  Negligence for such a penalty is a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  <u>Marcello v. Commissioner</u>, 380 F.2d 499, 506 (5th Cir. 1967), <u>cert. denied</u>, 389 U.S. 1044 \* \* \* (1968).  \* \* \*

Section 6694(b) allows a $500 penalty per return for "willful" attempts to understate tax liability with respect to any return or claim for refund.  26 U.S.C. § 6694(b). \* \* \*

The plain text of section 6701 ("knows") indicates that actual knowledge is necessary.  The Government must establish that the tax preparer "knows" the use of the return or other document will result in an understatement of tax liability.  "[A]ctual knowledge is a higher standard than the 'willfulness' standard utilized in other statutes.  Simply put, 'know' requires knowledge--awareness of the facts and the ultimate result of the conduct."  <u>Carlson v. United States</u>, 754 F.3d at 1229 (quoting <u>Sansom</u>, 703 F. Supp. at 1510); <u>see also</u> <u>Mattingly</u>, 924 F.2d at 791; <u>Warner v. United States</u>, 698 F. Supp. 877, 882 (S.D. Fla. 1988).

**[\*102]** Petitioner was the preparer of the schedules for Marin Johnson (1994 and 1996) and for Jim L. Westling (1996). Deficiency determinations for each case were considered by this Court. The question in <u>Johnson</u> was whether the taxpayer, a merchant seaman, could deduct meals and incidental expenses. The Court concluded in a published Opinion filed September 15, 2000, that the taxpayer (1) could use revenue procedures to ascertain the amount of deductible incidental expenses and (2) could <u>not</u> use the revenue procedures to deduct the cost of meals which were furnished by the taxpayer's employer. <u>Johnson v. Commissioner</u>, 115 T.C. at 227-228. The taxpayer in <u>Westling</u>, a tugboat captain, also claimed deductions for meals and incidental expenses. Meals were furnished by the taxpayer's employer at no cost. In a Memorandum Findings of Fact and Opinion filed the same date as <u>Johnson</u>, the Court concluded that the taxpayer could deduct the incidental expense portion using the revenue procedures. The opinion did <u>not</u> hold that the taxpayer could use the revenue procedures to deduct meal expenses he did not incur and in fact were for meals furnished by his employer. <u>Westling v. Commissioner</u>, 2000 WL 1310659, at \*2-\*3.

As indicated, the <u>Johnson</u> and <u>Westling</u> cases were decided in 2000, two years before the first tax year at issue in these cases. From 2000 forward, petitioner was aware that this Court did not "read the revenue procedures to allow

**[\*103]** a taxpayer to use the full M&IE rates when he or she incur[red] only incidental expenses." Johnson v. Commissioner, 115 T.C. at 227. The record reflects that petitioner read both the Johnson and Westling opinions shortly after their release on September 15, 2000. Petitioner further testified that he was involved in the examination of the Johnson and Westling returns, the administrative appeals, and the decision to litigate the issues before the Tax Court. He also testified that he was involved in preparing the cases for trial. After the Johnson and Westling opinions were released, petitioner produced advertisements in both professional magazines and on his business websites indicating that the taxpayers had won their respective cases. Petitioner also created documents for his clients in which he discussed the implication of the cases for future years' tax returns. In his article "Tug & Barge Sailors Entitled to Tax Deductions for Food" found in the April/May 2002 edition of Professional Mariner magazine, petitioner stated that the Federal Government allowed travel deductions "per [his] two Tax Court decisions". Likewise, in petitioner's client document "What Do Merchant Sailors Need to Provide Us to Get These Rather Large Travel Deductions" from late 2001 or 2002, he once again asserted the cases were "my decisions".

While the record is unclear as to the extent of petitioner's involvement in the Johnson and Westling litigation, petitioner's testimony of his direct

**[\*104]** involvement highlights the inconsistency of his statements, advertisements, and promotions, suggesting as declared outright in a document entitled "What about tug boat/barge mariners?" that he had "won twice in Tax Court". See supra note 14. Given petitioner's assertion of his involvement in the litigation of those two cases, there is no doubt that he clearly knew how this Court decided the issues relating to claimed deductions of mariner expenses.

Petitioner was also aware of and had read a series of revenue procedures issued by the Commissioner, beginning with Rev. Proc. 90-38, supra. This revenue procedure and its successors outlined the use of the M&IE rate while traveling away from home to deduct "deemed substantiated" unreimbursed meals and or incidental expenses as appropriate. Petitioner further asserts that he discussed the application of several of these revenue procedures with their IRS authors.[35] Petitioner seemed to suggest that representatives of the IRS sought his advice on implementation of some of the revenue procedures. His testimony is not credible, particularly after the Johnson and Westling opinions were issued. Further, petitioner was aware of and had read CCA 200242038 (Oct. 18, 2002)

---

[35]Petitioner asserts that he talked with Beverly A. Baughman, principal author of Rev. Proc. 90-60, 1990-2 C.B. 651; Edwin B. Cleverdon, principal author of Rev. Proc. 96-64, 1996-2 C.B. 427, and Rev. Proc. 97-59, 1997-2 C.B. 594; John L. Trevey, Jr., principal author of Rev. Proc. 2001-47, 2001-2 C.B. 332; and Christian Wood, principal author of Rev. Proc. 2004-60, 2004-2 C.B. 682.

[*105] and CCA 200343025 (Oct. 24, 2003), each of which addressed the fact that mariners who received free meals while working aboard a ship could claim deductions for incidental expenses of $3 per day and could not claim deductions for meals provided by their employers.

Petitioner's knowledge of the law regarding deductions for meal expenses was confirmed by a series of articles he arranged to publish in professional magazines aimed at mariners and on his website beginning in 2001. In particular, petitioner's article "Beware of magic numbers when tabulating your tax deductions", published in the February/March 2003 edition of Professional Mariner magazine, expressly warned oceangoing sailors to "remember your meals are normally provided, and claiming this additional meal deduction is considered to be double dipping."

Despite this warning petitioner sometimes provided contrary advice. For example, petitioner espoused a distinction for tug and barge sailors. In an article appearing in the April/May 2002 issue of Professional Mariner magazine, petitioner advised tug and barge sailors that they were in a unique situation for tax purposes because they were "commonly provided a food allowance for the boat that may average only $10 per day" in contrast to the jobs of oceangoing sailors aboard container ships "where all lodging and meals were assumed to be

[*106] completely provided". See supra pp. 23-24. In an article from the February/March 2003 edition of Professional Mariner magazine, petitioner detailed the specifics of the purported distinction, advising tug and barge sailors that they could use the full M&IE rate so long as they reduced it by the amount of the "grocery allowance" provided by their employers. See supra pp. 25, 28-35, 45.

As shown by evidence in the record, the "grocery allowance" actually refers to the industry description of grocery budgets for the food provided aboard vessels. The testimony of industry witnesses reflects that shipping companies generally provided three full meals per day for all of their mariner employees while they were aboard the vessels. See supra pp. 28-35. The testimony of Mr. Roach, one of petitioner's mariner clients who worked for approximately 10 shipping companies over the course of his multidecade career, is particularly strong on this point. In his testimony Mr. Roach stated that he had "never paid for any meals on any ships in 40-something years" and "never heard of any" marine company that did not provide free meals to its employees while they were working aboard a vessel. See supra pp. 33-34, 39-40.

Petitioner's knowledge of this industry standard is evidenced by multiple telephone conversations between himself and Mr. Comeaux, the CFO of ECO. During these phone conversations Mr. Comeaux explained to petitioner that he

**[\*107]** believed deductions for meal expenses were improper for his employees because ECO provided all employees with meals at no charge while they were working aboard the company's vessels. See supra pp. 35-36.

Finally, in 2005 an associate of petitioner's LA attorney prepared a 12-page draft interoffice memorandum addressed to petitioner's LA attorney summarizing his "preliminary thoughts" regarding the legality of petitioner's position on meal deductions for mariners. The associate concluded that petitioner's positions were not supportable by caselaw or IRS administrative resources. Petitioner read the draft interoffice memorandum on or shortly after April 18, 2005. See supra pp. 51-52.

Petitioner testified that he had "numerous clients" for which meals were provided but for various reasons "they bought their own * * *. Some of them have dietary restrictions. I have some mariners that, for example, keep kosher. These ships don't keep--don't have kosher food on board; therefore, they have to buy their own and bring them aboard. Others have medical conditions where they have--they can only eat certain items, or have allergies, and therefore, they will bring their own food aboard." However, petitioner did not provide any documentary or other evidence to support these claims. To the contrary, petitioner testified that he did not always ask mariner clients whether meals were provided

**[\*108]** and did not keep a record of clients who allegedly paid for their own meals. At the time of preparation of the returns or preparation of the travel schedules, petitioner did not keep records reflecting the meal policy for each company that employed his mariner clients and did not make it a practice to ask his mariner clients about special circumstances pertaining to why they may or may not have paid some expenses for meals.

Instead, petitioner routinely asked each client how many days he or she was on a vessel. Petitioner then multiplied the number of days worked by the full M&IE rate. Petitioner would then reduce the M&IE deduction by an amount designated as a "grocery allowance"[36] purportedly provided by the client's employer. This "grocery allowance" was an amount designated by the employer and allocated to the employee. Petitioner then prepared a return or schedule claiming a deduction for the balance of the M&IE rate. This tax treatment was erroneous because a substantial portion of the balance of the M&IE claimed deduction represented the cost of meals which petitioner's client would not have

---

[36]As discussed supra pp. 25, 28-35, 45, the "grocery allowance" is an accounting device used by shipping companies to track the grocery budgets for the food provided aboard ships in the industry. The grocery allowance is used to purchase food to cook and serve meals to mariners in the industry; the grocery allowance is not distributed to the mariners individually. Mariners are generally provided three full meals per day while they are aboard the vessels.

**[\*109]** paid for in the usual course of employment. Each of petitioner's client's M&IE deduction should have been limited to a deduction for incidental expenses incurred while working aboard the vessel as fully described in <u>Johnson</u> and <u>Westling</u>.

Despite this extensive history as fully discussed herein, petitioner continued to advise claiming deductions for meal expenses on tax returns and schedules for mariners who had not incurred them. We conclude that petitioner had knowledge that the preparation of tax documents claiming meal expense deductions for his mariner clients, where those clients had not incurred meal expenses, had the potential to result in understatements of tax.

### 4. Understatement of Liability

With the "knowledge" element satisfied, the question arises whether the Government must establish that the use of the document will result in an "understatement".

In <u>Golletz v. United States</u>, No. 90 C 5666, 1991 WL 66371, at \*3 (N.D. Ill. Apr. 19, 1991), a tax preparer argued that the Government had not proven that an understatement existed as a result of documents he had prepared. Mr. Golletz argued that section 6701 established a condition precedent that there must be an actual understatement of tax before liability attaches. His argument rested on the

[*110] fact that his clients had not filed the returns that he prepared in their original form and so ultimately there was no understatement. The Court held to the contrary, stating that the phrase "if so used" implies that no such condition precedent exists. Id.

> [T]he intent of Congress was to impose liability for the act of aiding, assisting, procuring, or advising in a prohibited manner regardless of whether any document is ever filed that would result in an understatement of taxes. Kuchan [v. United States], 679 F. Supp. * * * [764,] 769 [(N.D. Ill. 1988)]. Section 6701 punishes conduct intended to result in tax code violations without regard to whether the underlying violation ever actually occurs. Id.

Golletz, 1991 WL 66371, at *3. Thus, the penalty applies where a tax document would have caused the harm "if so used," whether or not the taxpayer ever files an understated return. See id.; see also Bailey v. United States, 117 F.3d 1424 (9th Cir. 1997); Kuchan, 679 F. Supp. at 769. Following Golletz, it is clear that a client need not file a tax document resulting in an understatement in order for section 6701 to apply; a tax preparer needs only to have prepared one.

Petitioner argues that respondent has not met his burden because respondent has not determined a specific dollar amount of understatement for each tax return or document in evidence. We conclude that the plain text of section 6701 does not create the burden of proving a specific understated amount. The statute merely requires that respondent prove petitioner knew that the tax documents he produced

[*111] would result in understatements.  Respondent has provided clear and convincing evidence that petitioner consistently and deliberately acted to create tax documents that he knew would deprive the Government of tax.  See supra pp. 99-109.  Petitioner systematically claimed meal expenses on tax documents for mariners who had not incurred them, ignoring numerous revenue procedures, the decisions in Johnson and Westling, and the advice of his own counsel.  Through the production of those documents, petitioner acted to create an understatement of tax on each potential client tax return.  Petitioner produced a list of tax returns and other tax documents where he had improperly calculated the applicable M&IE rate.  Respondent then used those documents to determine the penalties.

The reasoning presented in United States v. Stinson, 729 F. App'x 891 (11th Cir. 2018), aff'g 239 F. Supp. 3d 1299 (M.D. Fla. 2017), is instructive to these cases.[37]  In Stinson, the U.S. Court of Appeals for the Eleventh Circuit discussed the requirements for enjoining an individual from engaging in conduct subject to a penalty under section 6701.  Id. at 896-897.  The court held that injunctive relief was appropriate where the individual had engaged in the proscribed conduct and

---

[37]While the legal proceeding in United v. Stinson, 729 F. App'x 891 (11th Cir. 2018), aff'g 239 F. Supp. 3d 1299 (M.D. Fla. 2017), involved an action to enjoin a preparer, the discussion portion of the opinion provides helpful legal analysis.

**[\*112]** that an injunction was necessary to prevent recurrence of the conduct. Id.
The court found injunctive relief appropriate because the tax preparer in question
had violated section 6701 by "filing tax returns on behalf of taxpayer customers
that claimed improper Schedule A deductions (including improper unreimbursed
employee expenses and fake charitable contributions), inflated and sometimes
completely fabricated Schedule C business expenses, and inaccurately calculated
eligibility for the EITC." Stinson, 239 F. Supp. 3d at 1323. Consequently, the
court found "that the Government had presented sufficient circumstantial
evidence, beyond mere inaccuracies in tax returns," during the District Court trial
to show that the return preparer "knowingly and deliberately stated inaccurate
amounts on tax returns in order to maximize customers' tax refunds" and that the
evidence was overwhelming that the return preparer "knew he was preparing and
filing [F]ederal tax returns designed to understate his customers' tax liabilities."
Stinson, 729 F. App'x at 897.

Here, as in Stinson, the entirety of the record weighs against petitioner. As
in Stinson, in 2007 the District Court, as affirmed by the Court of Appeals for the
Ninth Circuit, filed a judgment and permanent injunction against petitioner
regarding his tax practices. See Kapp, 564 F.3d 1103. The injunction
permanently enjoined petitioner from preparing or assisting in preparing Federal

**[*113]** tax returns claiming the MTD. Id. at 1105. The District Court found that an injunction was proper under section 7407 because petitioner had engaged in conduct subject to penalty under section 6694, understatement of a taxpayer's liability by a return preparer because of an unreasonable position not supported by substantial authority, and the court further found that an injunction was appropriate to prevent recurrence of the violation. Id. at 1109.

In affirming the District Court's judgment, the Court of Appeals concluded that when petitioner "claimed deductions on behalf of mariners who did not pay or incur meal expenses, he prepared returns that understated liability." Id. at 1110. In late August or September 2007 petitioner provided the DOJ and the District Court with a list of clients for whom he had claimed the MTD along with a certificate of compliance signed under penalty of perjury. See supra pp. 61-62. RA Campos later used the client list, which has never been amended, to compute the section 6701 penalties at issue in these cases.

The parties stipulated both the client list and the certificate of compliance. Therefore, the contents of the client list as they pertain to persons or entities for whom petitioner prepared returns, portions of returns, and refund claims that asserted or relied upon the MTD are found to be a matter of fact.

[*114] We agree with the Court of Appeals' holding that petitioner prepared returns that understated tax liabilities when he claimed the MTD on behalf of his clients. Respondent has presented sufficient cumulative evidence to show petitioner prepared and filed Federal tax documents that were designed to deprive the Government of tax owed and thus to create an understatement for each client on the client list. Consequently, each tax return was received into evidence on the basis of that client list. In regard to the third prong of section 6701(a), we conclude that petitioner knew that a portion of the returns in evidence (if so used) would result in understatements of the liabilities for tax of other persons.

As indicated, the initial assessment of the section 6701 penalties for the years in issue was made using the client list identifying 5,167 returns. Respondent now agrees that there are 3,447 relevant tax returns in this record.[38] Respondent further conceded that the claimed deductions on 229 of those returns do not cause understatements of tax. On the basis of the Court's analysis above and further consideration of these agreements and concessions, we conclude that petitioner is

---

[38]Of the 3,450 tax returns in the record, three are tax returns for tax year 2001, a year not in issue. Consequently, only 3,447 returns are relevant to our decision.

[*115] liable for penalties to the extent of 3,218 tax returns (3,447 – 229).[39]

Respondent's determination is sustained to the extent of $3,218,000.

We have considered all of the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order and decisions</u>

<u>will be entered</u>.

---

[39]Per the discussion <u>supra</u> note 28, it is unclear whether the three tax returns for tax year 2001 which are not at issue in these cases are included in the 229 returns that do not have understatements if the MTD is removed. Because of this, we have subtracted those 229 returns from the 3,447 relevant tax returns for the years in issue when calculating the total number of returns for which petitioner is liable for penalties under sec. 6701.

**[*116]**                                       APPENDIX A

The following example is a reproduction of a sample sailor's travel schedule

prepared by petitioner for his clients.

| YEAR | FEDERAL STATEMENTS | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | **PAGE 1** |
| | [Client Name] | | | | | |

**Statement 1**

**Form 1040**

**Wage Schedule**

| Taxpayer-Employer | Wages | Federal W/H | FICA | Midi-care | State W/H | SDI |
|---|---|---|---|---|---|---|
| [Employer] | | | | | | |
| Grand Total | | | | | | |

**Statement 2**

**Schedule A, Line 22**

**Other Expenses**

Sailor Req'd Pager/Calls.............................................................................. $ _____

Sailor Uniforms/Cleaning.............................................................................. _____

Sailor Union Dues.............................................................................. _____

$ _____

**[*117]**

**SCHEDULE A   Line 20 - Supplemental Sailor Travel Schedule - [Year]**

**Name: [Client Name]**                                           **SSN:     XXX-XX-XXXX**

Taxpayer is a **Merchant Sailor** assigned to work aboard various "Common Carrier" Cargo Ships traveling between ports located around the entire Pacific Ocean.  Attached CPA Society Website acknowledges **this tax preparer wins both** Marin Johnson ("Johnson") & Jim Westling T.C. Memo. 2000-289 ("Westling") Tax Court mariner **decisions** discussed below.  This travel package format has already been legally endorsed by the U.S. Tax Court in Washington D.C.:

*"We [the U.S. Tax Court] held that the taxpayer [Marin Johnson] could deduct those [mariner travel] amounts because his records met as to those costs the **time, place,** and **business purpose requirements of section 1.274-5T(b)(2).** The taxpayer's records showed clearly: (1) The dates of his departure And return from each city that he visited while away from home (the time requirements), (2) the cities or points of locality of travel (the place requirement), and (2) the business nexus between his employment and his travel (the business purpose requirement). **See Johnson v. Commissioner**, supra"* [Westling Pg 9]

**NOTE** - Taxpayer worked for a California Employer that is **required by State Law to be charged for his meals and lodging as part of his "imputed"** wages.  See following 2 pages. *This **conflicts** with Johnson decision.* [Pg 21]

The attached **MARIN JOHNSON TAX COURT DECISION** legally declared the **"TAX HOME" for mariners is their residence** [Johnson Pg 20] and <u>not</u> their ship or "port of departure."  The Johnson Tax Court decision further clarified that *seamen **could rely** upon Federal Travel Regulations* (FTR) and the now 18 IRS issued travel revenue procedures [Johnson Pg 25] **"deemed substantiated" travel rates** for any **Lodging [Johnson Pg 16], Meals [Johnson Pg 25], and/or *Incidentals* [Johnson Pg 29 & 30].  For 2005 attached Rev Proc 2004-60 §6.01 allows using attached Pub 1542's Non-Foreign OCONUS Rates, Foreign OCONUS Rates and Domestic CONUS Rates for EACH CITY** as follows:

| | | |
|---|---|---|
| 20 Days x $92 | Hawaii \<Other\> | = 1,840. |
| 17 Days x $96 | Honolulu, Hawaii | = 1,632. |

**[*118]**

| 16 Days x $51 | Los Angeles, California | 816 |
|---|---|---|
| 14 Days x $51 | Long Beach <L.A.>, California | = 714. |
| I0 Days x $43 | Oakland, California | = 430. |
| 3 Days x $131 | Pusan, South Korea | = 393. |
| 3 Days x $129 | Yantian <Hong Kong>, China | = 387. |
| 2 Days x $172 | Kobe, Japan | = 344. |
| 19 Days x $18 | Hawaii <Other> | = 342. |
| 2 Days x $133 | Yokohama, Japan | = 266. |
| 2 Days x $124 | Xiamen <Shanghai>, China | = 248. |
| 2 Days x $83 | Kaohsiung, Taiwan | = 166. |
| 47 Days x $3 | Std OCONUS <Other>, Foreign | = 141. |
| | | 7,719. |

Total Sailor Travel Costs Allowed per OCONUS/CONUS Rates & FTR

301-11.17 stating **"Common Carrier" meals do not affect Per Diem**

---

**SCHEDULE A   Line 20 - Supplemental Sailor Travel Schedule - [Year]**

**Name: [Client Name]**                                    **SSN:   XXX-XX-XXXX**

---

As a **MERCHANT SAILOR**, taxpayer was <u>*required*</u> by his employer to travel to various locations to meet his

ships. **Per IRS Rev Rul 99-7 and attached Marin Johnson Tax Court Decision**, his auto mileage and other

travel-related costs are **FULLY DEDUCTIBLE** as follows:

    Taxi Fares & Other Travel Related Costs                          $_____

As a MERCHANT SAILOR, taxpayer was forced by his attached Union Letter to personally show up at his

Union Hall to look for his next work assignment. He was NOT ALLOWED to simply phone his Union Hall to

see what new jobs were currently available. Per attached IRS Publication 17, auto mileage and other

travel-related costs back and forth to his Union Hall looking for work are FULLY DEDUCTIBLE as follows:

    Total Mileage: ____ miles x $_____                          =_____

Total Tax Court & IRS Allowed Sailor Travel & Auto Mileage          _____

*SEE FTR 301-11.17 - PER DIEM STILL ALLOWED WHILE ABOARD* **"Common Carriers."**

✓   *See Rev Proc 2004-60 Pg 10 - Federal Travel Regulations (FTR) will be followed.*

✓   *See employer-provided sailor "sea-time" & travel reimbursement letter.*

**[*119]**

✓ *See attached **"News You Can Use from** IRS" - use "Hawaii Other" travel rate.*

✓ **NOTE - Calif Requires Sailors' W-2 to reflect "Value of Meals & Lodging."**

✓ **See attached Tax Research - Sailor Exception from "Percentage Limitations"**

✓ *See attached Official Ship's "Ports-of-Call" Travel Schedule.*

✓ *See Sailor Day-by-Day Travel & Tax Court Established Daily Gov't Rates.*

✓ *See attached Official U.S. Coast Guard Sailor's Travel Documents.*

✓ *See attached Tax Court Case - Marin I Johnson v. Comm., 115 T.C. 210 (2000)*

✓ *See Tax Court Case - "Beech Trucking" (2002) affirming "Johnson Decision."*

✓ **See CPA Article - <u>THIS</u> <u>Tax</u> <u>Preparer</u> wins Johnson ~ Westling Decisions.**

✓ *See attached RIA Research regarding law changes from "Johnson Decision."*

✓ *See attached Rev Proc 2004-60 Sailor Travel Deductions <u>Fully</u> Allowed.*

✓ *See attached Union Letter & Pub 17 Regarding Sailor Travel to Union Halls.*

✓ *See attached Official IRS Non-Foreign OCONUS Rates for <u>each</u> city listed.*

✓ See attached Official IRS Foreign OCONUS Rates for <u>each</u> city listed.

✓ See attached Official IRS Domestic CONUS Rates for <u>each</u> city listed.

✓ **This Travel Protocol Developed by <u>Preparer</u> & Approved by US Tax Court.**

✓ **This Travel Protocol & Attachments Covered by United States Patent** 6,978,254.

[*120]                              APPENDIX B

The following is an excerpt from the transcript of the deposition of Martin

A. Kapp which was conducted for the civil injunction, as recorded on September

25, 2006.  During the deposition counsel for the Government asked petitioner

questions about the relevant revenue procedures and the Code sections relevant to

the mariner tax deduction.  Petitioner answered as follows:

Q:    Okay.  For an offshore vessel employee, does it matter

      whether or not their employer provided the meal for free

      as to whether or not you'll claim a meal deduction?

A:    That's correct.  The revenue procedures does not make

      any distinction if meals are provided or not provided.  It

      is irrelevant to claiming a meal deduction.

Q:    So if they are away from home and could benefit from a large

      itemized deduction, you could claim that on their return even if

      the meals have been provided by their employers?

A:    That's correct.

Q:    And what is your basis for that?

A:    18 I.R.S. revenue procedures.  And it's stated in I.R.S.

      Publication 17 and 4-63 for the last 18 years.  So you got 36

[*121]     I.R.S. publications encouraging taxpayers in this group to take automatic daily meal deductions.

Q:     Okay. Even if their employers [sic] provide a meal?

A:     That is correct. There is nothing in the publications and there is nothing in the revenue procedures that preclude transportation industry employees from claiming meals if they are traveling.

Q:     Well, what about the Internal Revenue Code?

A:     All 18 revenue procedures specifically discuss in section 2 in the background that the Commissioner is given right to weigh substantiation requirements in certain circumstances including for travel, and the I.R.S. under that authority under the Commissioner is exercising their prerogative and is waiving the substantiation requirements.

Q:     What about the part of the Internal Revenue Code that requires the taxpayer to pay any incurring expense?

A:     That's been waived by these revenue procedures.

**[*122]**                          APPENDIX C

The following is an excerpt from <u>United States v. Kapp</u>, 564 F.3d 1103,

1109-1113 (9th Cir. 2009):

**B. Kapp prepared returns that understated tax liability.**

     Kapp argues that mariners do not have to pay or incur meal expenses in order to claim a deduction under the regulations that allow certain expenses to be deemed substantiated without documentation. * * *

\*       \*       \*       \*       \*       \*       \*

Because Kapp claimed deductions on behalf of mariners who did not pay or incur meal expenses, he prepared returns that understated liability.

**C. Kapp's Position was unreasonable.**

\*       \*       \*       \*       \*       \*       \*

     Kapp's assertion that deep sea mariners were permitted to take the mariner's tax deduction is patently unreasonable in light of the ruling in the <u>Johnson</u> case. * * * Kapp unsuccessfully attempts to distinguish <u>Johnson</u>, but the clear implication of the holding is that taxpayers may not deduct meal expenses when no such expenses are incurred. Kapp acknowledged as much himself in his <u>The Professional Mariner</u> articles.

\*       \*       \*       \*       \*       \*       \*

     Kapp argues that claiming the mariner's tax deduction for tug and barge mariners was reasonable because <u>Johnson</u> applied only to deep sea mariners. He contends that taking the deduction on behalf of tug and barge mariners, who return to port more frequently,

[*123] presented novel issues. Although the <u>Johnson</u> case arose from a slightly different factual situation, the principles of the Tax Court's holding clearly extend to tug and bar mariners. The essence of the court's holding is that individuals may not deduct the full M&IE rate when they do not incur meal expenses. By extension, if tug and barge mariners do not incur meal expenses, they may not take a deduction. The frequency of a mariner's return to port is irrelevant to the holding of the case.

A memorandum prepared by an associate of Kapp's * * * [LA attorney] concluded there was little support for Kapp's position that tug and barge mariners could deduct meal expenses when no cost was incurred. Although Kapp claims that he asked * * * [his LA attorney] to play "devil's advocate" and draft a memorandum that laid out the arguments in opposition to his position, the memorandum presents an even-handed examination of the issue and states that "little if any authority relied on by Mr. Kapp supports the position he takes." * * *

\*     \*     \*     \*     \*     \*     \*

**E. Good faith defense**

A tax preparer who prepares a return that understates liability due to an unreasonable position may still avoid a penalty under § 6694 if he can show that there is reasonable cause for the understatement and he acted in good faith. I.R.C. § 6694(a)(2)(B), (a)(3). * * *

Kapp argues that he is not subject to a penalty because he acted in good faith by seeking the advice of numerous government officials and attorneys. * * *

\*     \*     \*     \*     \*     \*     \*

Kapp's counsel during the investigation, the only attorneys who appear to have analyzed his position in light of all the relevant facts, concluded that he was not entitled to claim the deduction. [Citations omitted.]